**Yvette JONES, Personal Representative of the Estate of Raymond E. Jones, Deceased, Plaintiff,**

v.

**CORRECTIONAL MEDICAL SERVICES, INC., Craig Hutchinson, George Pramstaller, Nancy Martin, Kathleen Salazar, Michael Wilkinson, Tamerla Hamilton, Renee A. Vanhouten, David Vanarsdale, Sherri Castenholtz, and Badawi Abdellatif, Defendants.**

No. 1:09–cv–392.

United States District Court, W.D. Michigan, Southern Division.

Feb. 24, 2012.

---

Kenneth D. Finegood, Kenneth D. Finegood PLC, Southfield, MI, for Plaintiff.

Brian J. Richtarcik, Mark Gregory Reynolds, Randall Alan Juip, James T. Farrell, The Juip Richtarcik Law Firm, Detroit, MI, Kevin Himebaugh, James T. Farrell, MI Dept. Attorney General, Lansing, MI, for Defendants.

## OPINION AND ORDER GRANTING DEFENDANTS CORRECTIONAL MEDICAL SERVICES, INC. AND CRAIG HUTCHINSON, M.D.'S MOTION TO DISMISS AND/OR MOTION FOR SUMMARY JUDGMENT

## AND

## OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT BADAWI ABDELLATIF'S MOTION TO DISMISS AND/OR MOTION FOR SUMMARY JUDGMENT

PAUL L. MALONEY, Chief Judge.

In October 2007, Raymond E. Jones died of viral meningoencephalitis while under the control of the Michigan Department of Corrections. Plaintiff, personal

representative of Mr. Jones's estate, brings claims against various defendants for their alleged role in Mr. Jones's death, under 42 U.S.C. § 1983 and a tort theory of gross negligence and intentional infliction of emotional distress. (First Am. Compl., ECF No. 44) Before the court today are two Motions to Dismiss and/or for Summary Judgment: one filed by Defendants Correctional Medical Services, Inc. and Craig Hutchinson, M.D. (ECF No. 94), and one filed by Defendant Badawi Abdellatif, M.D. (ECF No. 139).

For the reasons discussed herein, the court will grant the motion of Defendants Correctional Medical Services, Inc. and Craig Hutchinson and will grant in part and deny in part the motion of Defendant Badawi Abdellatif.

## I. BACKGROUND[1]

On September 26, 2007, Raymond E. Jones died of viral meningoencephalitis. Mr. Jones, a prisoner at the Ernest Brooks Facility, under the control of the Michigan Department of Corrections ("MDOC"), had first begun complaining of a strange dizziness 28 days earlier, on August 29, 2007. This suit concerns the treatment and care that Mr. Jones received during those four weeks, alleging that defendants' actions make them liable under 42 U.S.C. § 1983, the Michigan Wrongful Death Act, and the tort doctrines of gross negligence and intentional infliction of emotional distress.

No one corporation or governmental department is entirely responsible for providing health care to Michigan prisoners. Instead, several different entities provide services at various points in the process. The MDOC itself employs Registered Nurses ("RNs") who provide direct care for prisoners, but it has contracted out part of its health-care duties to Defendant Correctional Medical Services ("CMS"). CMS employs doctors, either as employees or as independent contractors, to care for prisoners directly. Both CMS and the MDOC also rely on outside hospitals to provide care, presumably that which they are unable ·or ill-suited to provide. This case is at least partly about the precise responsibilities and actions of each of these entities, and the roles that each played in Mr. Jones's medical care, or lack thereof, and his ultimate demise.

Raymond Jones first complained of dizziness on August 29, 2007. He told prison staff that he was getting dizzy when he closed or rubbed his eyes, turned his head, or stood up. (Medical Record, ECF No. 154, Ex. 1 at 1–2.) He was evaluated by MDOC-employed registered nurses over the next several days,[2] but his problems continued. Mr. Jones's symptoms soon worsened, and he began reporting ear pain, eye sensitivity, nausea, and an inability to walk. (Id. at 3–11.)

Mr. Jones continued to bring his complaints to the prison medical staff over the next 13 days, while his symptoms continued to trouble him. He informed nurses that, among other things, he couldn't see out of one eye because of the dizziness, he had been throwing up for at least two

---

1. For the purposes of a motion for summary judgment, these facts, and any inferences drawn from them, are to be viewed in the light most favorable to the nonmoving party—here, Plaintiff. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (quoting *Matsushita Elec. Indust. Co. v. Zenith Radio Corp.*, 475 U.S.

574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)).

2. Discussion here is limited to the facts relevant to the issues presented in Defendants' motions. As the MDOC nurses' actions are generally not at issue today, they are only discussed briefly.

days, and he had a pain in his right ear that he rated a five out of ten. (*Id.* at 12.) On September 8, he was taken to Health Services in a wheelchair, showing a high temperature and high blood pressure. (*Id.* at 13–14.)

During this time, other inmates began to get concerned about Mr. Jones's health. One man, Troy Reinstra, contacted his mother about Mr. Jones's health problems and asked her if she would get in contact with Doug Tjapkes, a prisoner advocate with Humanity for Prisoners, about getting Mr. Jones some medical care. (*See* Reinstra Dep., ECF. No. 154, App'x, at 12–17; Reinstra Aff., ECF No. 154, Ex. 10.) Mr. Jones's bunkmate, Jesse Hawkins, and Kenneth Mazurek, another inmate at the facility, also signed affidavits testifying to Mr. Jones's deteriorating condition. (*See* Hawkins Aff., Mazurek Aff., ECF No. 154, Ex. 10.)

Despite these symptoms, Mr. Jones was not seen by a doctor until September 11, almost two weeks after he first complained of dizziness. Dr. Abdellatif, who was employed by CMS, examined Mr. Jones and assessed him as having "[u]nexplained headaches[,] double vision[,] and dizziness with loss of balance," as well as high blood pressure. (Medical Record, ECF No. 154, at 19.) Dr. Abdellatif noted the need to rule out "brain pathology," and he ordered Mr. Jones sent to the emergency room for further evaluation. (*Id.*) Dr. Abdellatif testified at deposition that he did not call the hospital to advise them regarding Mr. Jones's status or symptoms, (Abdellatif Dep., ECF No. 154, App'x, at 67–68.) Nor do the records show that Mr. Jones's medical records were sent with him to the emergency room. (*See* Buchanan Dep., ECF No. 154, App'x, at 57.)

Mr. Jones's symptoms remained when he returned from the hospital later that day. (Medical Record, ECF No. 154, Ex.

1 at 22.) When Dr. Abdellatif saw him again the next day, Mr. Jones again showed high blood pressure, as well as a 5–pound weight loss in the last 24 hours. (*Id.*) Mr. Jones told Dr. Abdellatif that he had a CT scan at the hospital and that the results were normal, but Dr. Abdellatif did not contact the hospital to obtain the actual test results. (*Id.* at 25; Abdellatif Dep., ECF No. 154, App'x, at 78–79.) After this examination, Dr. Abdellatif ordered Mr. Jones returned to the emergency room. (Medical Record, ECF No. 154, Ex. 1, at 24–25.) While Dr. Abdellatif testifies that he talked to the emergency room this time about Mr. Jones's situation, there is a discrepancy between the prison's medical records, which state that he did talk to the emergency room, and the version of the records provided to the emergency room, which does not contain any such notation. (*Compare id.* at 25–26; *with* Hospital Record, ECF No. 154, Ex. 8.) Further, the emergency room doctor does not recall any conversation with Dr. Abdellatif, or indeed, any other prison physician, about admitting a prisoner to the hospital. (Evans Dep., ECF No. 154, App'x, at 47–54.) Nor do the hospital records include any information regarding such a call, as would be required by hospital policy. (*See id.* at 48.)

Again, Mr. Jones was sent to the emergency room, and again, he was returned that day. (Medical Record, ECF No. 154, Ex. 1, at 26–28.) Dr. Abdellatif did not see Mr. Jones when he returned. Instead, an MDOC nurse examined Mr. Jones, who stated that he was "scared." (*Id.* at 31.) Mr. Jones told the nurse that the right side of his face was numb and that he felt like he was floating. His right eye was "asymmetrical and wandering," and Mr. Jones was unable to swallow his own saliva. (*Id.*) The nurse consulted with another prison's hospital and was ordered to send

him to the emergency room for a third time. (*Id.*)

This time, Mr. Jones went to the ER of a different hospital. He again returned to the prison shortly thereafter. Dr. Abdellatif evaluated Mr. Jones the next day, September 13. Mr. Jones was still exhibiting symptoms, and his blood pressure was now up to 173/119. He was "unsteady on [his] feet" and claimed that he couldn't swallow and "need[ed] water bad." (*Id.* at 37.) Dr. Abdellatif prescribed some medicines and ordered that Mr. Jones be given a bottom bunk and a liquid diet. (*Id.* at 34–35.)

The next day, September 14, Dr. Abdellatif contacted the hospital and arranged for Mr. Jones to be admitted. (*Id.* at 40–41.) At the hospital, Mr. Jones was diagnosed with meningoencephalitis, an inflammation of the brain and meninges, the membranes covering the central nervous system. He remained at the hospital until September 26, when he died.

Plaintiff Yvette Jones ("Plaintiff") filed the present suit as personal representative of Mr. Jones's estate, naming as defendants Correctional Medical Services ("CMS"), which has contracted to provide health care to MDOC prisoners; Craig Hutchinson, regional medical director of CMS; Badawi Abdellatif, M.D., a doctor who provided Mr. Jones with medical care under contract with CMS; and a number of MDOC employees who are not parties to these motions.[3] Based on Defendants' respective roles in Mr. Jones's death, Plaintiff claims damages under 42 U.S.C. § 1983,[4] the Michigan Wrongful Death

Act, and the tort doctrines of gross negligence and intentional infliction of emotional distress.

In these two Motions, Defendants CMS and Hutchinson (ECF No. 94), and Defendant Abdellatif (ECF No. 139), ask the court to dismiss Plaintiff's claims against them. Each Motion is fashioned as a Motion to Dismiss *and/or* a Motion for Summary Judgment, and Defendants argue both Rule 12(b)(6) and Rule 56 in their briefing. After a hearing regarding both motions, held on October 31, 2011, Plaintiff and Defendant Abdellatif filed supplemental briefing, per this court's request, on whether certain aspects of Michigan's medical-malpractice statute apply to Plaintiff's tort claims.

## II. ANALYSIS

As an initial matter, the court can dispose of Plaintiff's "gross negligence" and "intentional infliction of emotional distress" claims (Count III) against Defendants CMS and Hutchinson. These two defendants argue that Plaintiff's allegations fail to state a claim on which relief can be granted. (ECF No. 94, 11–16.) Plaintiff does not contest these claims, and indeed she agrees to dismissal of both tort claims against these two defendants: "Counsel stipulates to partial summary judgment on plaintiff's claims for gross negligence against CMS and Dr. Hutchinson, including any claims for intentional infliction of emotional distress." (Pl.'s Resp., ECF No. 104, at 10.)

---

3. The MDOC employees named as defendants are: George Pramstaller; Nancy Martin; Kathleen Salazar, RN; Michael Wilkinson, RN; Tamerla Hamilton, RN; Renee A. Vanhouten, RN; David Vanarsdale, RN; and Sherri Castenholtz, RN. (*First Am. Compl.*, ECF No. 44.)

4. Plaintiff's First Amended Complaint (ECF No. 44) includes two counts based on 42 U.S.C. § 1983. Count 1 is directed against the individual defendants, while Count 2 pleads "supervisory liability" against CMS, Hutchinson, and two other defendants.

## A. Legal Framework

Summary judgment is appropriate only if the pleadings, depositions, answers to interrogatories and admissions, together with the affidavits, show there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law. Fed.R.Civ.P. 56(c); *Tucker v. Tennessee*, 539 F.3d 526, 531 (6th Cir. 2008). The burden is on the moving party to show that no genuine issue of material fact exists, but that burden may be discharged by pointing out the absence of evidence to support the nonmoving party's case. *Bennett v. City of Eastpointe*, 410 F.3d 810, 817 (6th Cir.2005) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). The facts, and the inferences drawn from them, must be viewed in the light most favorable to the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)). Once the moving party has carried its burden, the nonmoving party must set forth specific facts in the record showing there is a genuine issue for trial. Fed.R.Civ.P. 56(e); *Matsushita*, 475 U.S. at 586, 106 S.Ct. 1348. The question is "whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251–252, 106 S.Ct. 2505.

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). When considering whether to grant a 12(b)(6) motion, a court primarily considers the allegations in the complaint itself, but the court may also take into account exhibits attached to the complaint, matters of public record, and certain other items. *Amini v. Oberlin College*, 259 F.3d 493, 502 (6th Cir.2001). The defendant bears the burden of establishing that the plaintiff has failed to state a claim upon which relief may be granted. *Directv, Inc. v. Treesh*, 487 F.3d 471, 476 (6th Cir.2007).

## B. Plaintiff's Section 1983 Claim Against CMS

■ Plaintiff claims that defendants, including CMS, violated the Eighth Amendment's prohibition of cruel and unusual punishment. Treatment of a prisoner violates the Eighth Amendment when it constitutes "deliberate indifference to [the] prisoner's serious illness or injury." *Estelle v. Gamble*, 429 U.S. 97, 104–05, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976).

Count II of Plaintiff's First Amended Complaint alleges Section 1983 "supervisory liability" against CMS. Defendant CMS argues that the doctrines of vicarious liability and *respondeat superior* do not apply in Section 1983 actions. Instead, Section 1983 liability against a private corporation such as CMS requires that the plaintiff show that its injury resulted from a policy, practice, or procedure of that corporation. According to CMS, not only has Plaintiff failed to uncover any facts that demonstrate such a policy, practice, or procedure, but in fact it cannot do so, because CMS provided its medical services under MDOC policies, not its own. CMS asserts that Plaintiff knows this, as her attorney acknowledged before Magistrate Judge Scoville:

Well, to be perfectly straightforward with your Honor, my original understanding, although incorrect ultimately, was that CMS was responsible as the

medical service provider for the MDOC for the policies and practices of the Michigan Department of Corrections. That's not true. **That's incorrect, and the policies and practices lie directly with the MDOC itself.** (Def.'s Br., ECF No. 94, Ex. B, at 6.) Thus, according to Defendant, the evidence shows no genuine dispute regarding any fact that would allow the claim against it to go forward.

■ Defendant is correct that CMS cannot be held liable under Section 1983 on a supervisory liability theory. Because CMS was providing medical services to inmates under contract with MDOC, it may properly be sued under Section 1983. *See Hicks v. Frey,* 992 F.2d 1450, 1458 (6th Cir.1993). But the Supreme Court disallowed Section 1983 *respondeat superior* liability in *Monell v. Department of Social Services,* 436 U.S. 658, 691, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978) ("[A] municipality cannot be held liable under § 1983 on a *respondeat superior* theory"). Instead, a government body—or a nongovernmental entity such as CMS, in this case—can be found liable under Section 1983 where a constitutional wrong arises from execution of that entity's policies or customs. *Id.* at 694, 98 S.Ct. 2018. A "custom" here need not be formally approved or officially adopted by the entity, however. As the *Monell* Court noted: "Although not authorized by written law, such practices of state officials could well be so permanent and well settled as to constitute a 'custom or usage' with the force of law." *Id.* at 691, 98 S.Ct. 2018 (quoting *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 167–68, 90 S.Ct.

1598, 26 L.Ed.2d 142 (1970)) (quotation marks omitted).

■ For her claim to succeed, Plaintiff must therefore: (1) identify a policy or custom; (2) connect the policy or custom to CMS; and (3) show that executing that policy amounted to deliberate indifference to Mr. Jones's illness. *See Garner v. Memphis Police Dep't,* 8 F.3d 358, 364 (6th Cir.1993) (holding that "to satisfy the Monell requirements a plaintiff must identify the policy, connect the policy to the city itself and show that the particular injury was incurred because of the execution of that policy" (internal quotation marks omitted)).

■ Though Plaintiff has pleaded that Defendants, including CMS, maintained a number of "customs and/or policies and practices" (First Am. Compl., ECF No. 44, at 15–16), the court finds that Defendant's showing meets its initial burden by pointing out the absence of evidence connecting any policy or custom to CMS in particular. To avoid summary judgment, then, Plaintiff must draw this court's attention to specific facts in the record showing that there is a genuine issue here.

Plaintiff asserts that she has in fact "set forth genuine issues of fact regarding the customs and practices of defendant CMS." (Pl.'s Resp., ECF No. 104, at 10.) Plaintiff's factual support, however, consists largely of a page-long block quote from the report of her expert, Dr. Jerry Walden, and several citations to Mr. Jones's medical record.[5] (*See id.* at 12–13.)

---

**5.** Plaintiff's response brief also attaches a series of emails wherein Penny Ryder of the American Friends Service Committee attempts to ensure that Mr. Jones is getting proper care, along with an affidavit from Ms. Ryder regarding those attempts. These exhibits, however, involve only MDOC employees; they do not mention CMS or Hutchinson, and there is no evidence that either defendant was even aware of Ms. Ryder's emails. These exhibits thus do not support Plaintiff's allegation that CMS's policies, practices, or procedures contributed to Mr. Jones's death.

In the cited portion of his report, Dr. Walden allegedly "identifies multiple systemic failures of CMS, (sic) and its medical director Craig Hutchinson, MD" regarding their treatment of Mr. Jones. (*Id.* at 12.) These quotes, however, provide no support for Plaintiff's claim that CMS policies or customs were involved in Mr. Jones's treatment. For instance, Dr. Walden states that "Dr. Hutchinson and Dr. Pramstellar shared the responsibility to have a reporting system from the ER that was timely" and that "Drs. Hutchinson and Pramstellar along with Mr. Straub shared responsibility for the failure to enact an oncall (sic) program to back up the nurses when the doctor or PA was absent from LRF." (Walden Rep., ECF No. 104, Ex. 2, at 13.) But he cites to no facts on the record that would support these bare assertions. Similarly, Dr. Walden fails to support his claim that "the administration of ... CMS ignored" the American Friends Service Committee's attempt to intervene. (*Id.* at 15.) Dr. Walden argues that "delayed reporting" was "the standard" and that "the healthcare bureaucracy" caused delays that harmed Mr. Jones (*id.* at 13), but he makes no assertion—let alone an assertion backed up with citations to record evidence—that CMS, rather than MDOC, is responsible for that bureaucracy or standard. Other of Dr. Walden's claims make only case-specific criticisms, with no apparent connection to a policy or custom. (*See, e.g., id.* at 15 ("[Mr. Jones's severe symptoms] were apparent to even a lay person and should have caused Jones to have received early physician evaluation and led to earlier hospital care when he was likely to survive.").) Yet other claims relate explicitly to MDOC and not CMS. (*See, e.g., id.* ("The Risk Management officer and the Chief Medical Officer [both MDOC employees] gave Jones no help at all!").)

The rest of Dr. Walden's report fares no better on this discrete issue. The report makes no reference to CMS policies or customs, though Dr. Walden does state that he had reviewed "Michigan Department of Correction policies" (*id.* at 1), and the report refers to these MDOC policies in several places. (*See id.* at 2, 8, 9.) The bulk of Dr. Walden's report is a discussion of Mr. Jones's individual case, with no reference to CMS's or its doctors' standard procedures.

■ Mr. Jones's medical record similarly makes no reference to any CMS policies. (*See* ECF No. 94, Ex. A.) Nor does it suggest any CMS custom that may have contributed to Mr. Jones's death. In fact, nothing in the medical record links CMS itself to any particular actions taken during Mr. Jones's treatment. Nor is there any evidence of a relevant CMS custom. To constitute a custom for purposes of Section 1983, a pattern of action must " 'be so permanent and well settled as to constitute a custom or usage with the force of law.' " *Vereecke v. Huron Valley Sch. Dist.,* 609 F.3d 392, 403 (6th Cir.2010) (quoting *Monell,* 436 U.S. at 691, 98 S.Ct. 2018). Plaintiff identifies no evidence of a settled course of action by CMS or its doctors that could constitute a "custom" for Section 1983 purposes.

Plaintiff's briefing does not address its counsel's in-court admission that the relevant "policies and practices lie directly with the MDOC itself," rather than with CMS. At the motion hearing, Plaintiff's counsel backtracked, alleging that CMS formerly left its doctors "out of the loop" once their shifts ended. But the record supports counsel's first statement much better than this one. Plaintiff simply identifies no evidence—and this court found none on its independent review of the record—regarding this practice or any other

CMS policy or practice relevant to Mr. Jones's treatment.

This court thus finds that there is no genuine dispute of material fact that would preserve Plaintiff's Section 1983 claim against CMS. CMS is entitled to summary judgment on this claim.[6]

## C. Plaintiff's Section 1983 Claim Against Hutchinson

The parties' arguments regarding the Section 1983 claim against Dr. Hutchinson are similar to the arguments regarding CMS itself. Defendants argue that there is no evidentiary basis for a Section 1983 claim against Dr. Hutchinson, as he "did not participate in the creation of any CMS policies and he was not personally involved in the treatment of Mr. Jones." (Def.'s Br., ECF No. 94, at 8.) Plaintiff again relies on citations to the medical record and Dr. Walden's expert report. (Pl.'s Resp., ECF No. 104, at 11–14.)

 Individual liability under Section 1983 typically requires that the defendant have personal involvement in the constitutional deprivation. As with governmental entities, the doctrine of *respondeat superior* does not apply to individuals. *See Hays v. Jefferson Cnty.*, 668 F.2d 869, 872 (6th Cir.1982) ("[L]iability of supervisory personnel must be based on more than merely the right to control employees."). "[A] failure of a supervisory official to supervise, control, or train the offending individual officers is not actionable absent a showing that the official either encouraged the specific incident of misconduct or in some other way directly

participated in it." At a minimum a plaintiff must show that the official at least implicitly authorized, approved, or knowingly acquiesced in the unconstitutional conduct of the offending officers. *Id.* at 874.

 Plaintiff's filings are somewhat unclear about the basis or bases of her claim against Dr. Hutchinson. Her argument lumps him in with CMS and the "policy or custom" claims, while the First Amended Complaint also appears to include a claim based on his individual action. (*See* First Am. Compl., ECF No. 44, at 11 (Count I).) Regardless of whether Plaintiff is advancing one or both of these arguments, however, this court finds that Plaintiff has failed to show a genuine dispute of material fact. As discussed above, the evidence on record does not suggest that CMS or Dr. Hutchinson had a hand in formulating any policies relevant to Mr. Jones's treatment, and Dr. Walden's report contains nothing more than bare assertions regarding Dr. Hutchinson's "responsibility" for various aspects of health care procedure. Neither does the evidence suggest that Dr. Hutchinson had any role in Mr. Jones's treatment. In short, Plaintiff points to no evidence linking Dr. Hutchinson to the events at issue here, and this court's independent review has uncovered no such evidence. Defendant Hutchinson's motion should therefore be granted.

## D. Plaintiff's Section 1983 Claim Against Abdellatif

In a separate motion, Defendant Abdellatif requests summary judgment dismissal

---

**6.** Plaintiff's briefing also argued that summary judgment should be denied because discovery was ongoing (Pl.'s Resp., ECF No. 104, at 14), though Plaintiff failed to provide an affidavit or declaration describing its position, as called for by Fed.R.Civ.P. 56(d). *See Summers v. Leis*, 368 F.3d 881, 887 (6th Cir. 2004) (holding under older version of rule that "in order to adequately oppose Leis's

motion for summary judgment, Summers should have filed a Fed.R.Civ.P. 56(f) affidavit explaining his need for additional discovery"). Discovery has since closed, however, and Plaintiff has made no effort to supplement its briefing or place newly-uncovered evidence before the court. As such, this court sees no reason to further delay its ruling on this motion.

of Plaintiff's Section 1983 claim against him. (ECF No. 139.)

### 1. Preliminary Issue: Plaintiff's Expert Witness Testimony

Defendant's briefing challenges in passing the qualifications of Plaintiff's expert witnesses. (Def.'s Br., ECF No. 139, at 16.) As the court noted at oral argument, this suggestion of an argument is not enough to allow this court to make a decision regarding any expert testimony at this time. *See Kingsley Assocs., Inc. v. Del–Met, Inc.,* 918 F.2d 1277, 1286 (6th Cir.1990) ("While a proposed expert witness' qualification to testify 'in the form of an opinion or otherwise,' is unquestionably a preliminary factual determination for the trial court, it is a determination which must be made upon the evidence of the witness's qualifications, or lack thereof, and not upon the trial court's personal views." (citations omitted)). Defendant has since moved to disqualify one of Plaintiff's expert witnesses, Dr. Jerry Walden, M.D. (ECF No. 176.) The parties are briefing this issue, and the court will hold a *Daubert* hearing to determine whether Dr. Walden satisfies the requirements of Fed.R.Evid. 702.

### 2. The Legal Standard of "Deliberate Indifference"

Treatment of a prisoner violates the Eighth Amendment when it constitutes "deliberate indifference to [the] prisoner's serious illness or injury." *Estelle v. Gamble,* 429 U.S. 97, 104–05, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). This analysis has two components. The first is objective, looking to whether the medical issue is sufficiently serious. *Farmer v. Brennan,* 511 U.S. 825, 834, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). The parties do not dispute the existence of a sufficiently serious medical issue here.

The second component is subjective, requiring that the actor have a "sufficiently culpable state of mind." *Id.* (quoting *Wilson v. Seiter,* 501 U.S. 294, 297, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991)). That is, the actor must "have subjectively perceived a risk of harm and then disregarded it." *Comstock v. McCrary,* 273 F.3d 693, 703 (6th Cir.2001). This component itself has two elements: knowledge and indifference. The "knowledge" element does not allow for constructive knowledge. It requires more than a misdiagnosis or a claim that defendant reasonably should have known about a risk. *Id.* As the Supreme Court has stated, "an official's failure to alleviate a significant risk that he ***should have perceived but did not,*** while no cause for commendation, cannot under our cases be condemned as the infliction of punishment." *Farmer,* 511 U.S. at 838, 114 S.Ct. 1970 (emphasis added). At the same time, the actor need not know of the risk to a 100% certainty. An inference of risk, if actually made and then disregarded, can constitute deliberate indifference. *Id.* at 837, 114 S.Ct. 1970. Similarly, a prison official may "not escape liability if the evidence showed that he merely refused to verify underlying facts that he strongly suspected to be true, or declined to confirm inferences of risk that he strongly suspected to exist." *Id.* at 843 n. 8, 114 S.Ct. 1970.

As for the action or inaction required for the "indifference" element, the Supreme Court has stated that deliberate indifference to a risk is equivalent to "recklessly disregarding" that risk or "failing to take reasonable measures to abate it." *Id.* at 836, 847, 114 S.Ct. 1970. The Sixth Circuit has noted that in cases involving prison medical care, "less flagrant conduct may constitute deliberate indifference" than in cases against other types of government official. *Terrance v. North-*

*ville Reg'l Psychiatric Hosp.,* 286 F.3d 834, 843 (6th Cir.2002). More particularly, the defendant must do more than simply provide *some* treatment. " '[A] prisoner is not required to show that he was literally ignored by the staff' to prove an Eighth Amendment violation, only that his serious medical needs were consciously disregarded." *LeMarbe v. Wisneski,* 266 F.3d 429, 439 (6th Cir.2001) (quoting *Sherrod v. Lingle,* 223 F.3d 605, 611–12 (7th Cir.2000)). Care that is "grossly inadequate" can also constitute deliberate indifference. *Terrance,* 286 F.3d at 843.

### 3. Subjective Perception of a Risk of Harm

 Defendant argues that "the evidence does not indicate that Dr. Abdellatif was aware that Mr. Jones had viral encephalitis." (Def.'s Br., ECF No. 139, at 14.) But this mistakes the relevant standard here. The law does not require Plaintiff to show that Abdellatif had diagnosed Mr. Jones's exact disease in order to prove that he acted with deliberate indifference to the risk. Though, as Defendant notes, the Supreme Court in *Farmer v. Brennan* stated that an official cannot be condemned for his "failure to alleviate a significant risk that he should have perceived but did not," 511 U.S. at 838, 114 S.Ct. 1970, the Court was discussing failure to perceive a risk *at all,* not failure to perceive the specific harm that ended up befalling the plaintiff. Indeed, the *Farmer* Court rejected this very line of reasoning: "Nor may a prison official escape liability for deliberate indifference by showing that, while he was aware of an obvious, substantial risk to inmate safety, he did not know that the complainant was especially likely to be assaulted by the specific prisoner who eventually committed the assault." *Id.* at 843, 114 S.Ct. 1970. Similarly, "[t]he question under the Eighth Amendment is whether prison officials ... ex-

posed a prisoner to a sufficiently substantial 'risk of serious damage to his future health,' and it does not matter whether the risk comes from a single source or multiple sources." *Id.* (quoting *Helling v. McKinney,* 509 U.S. 25, 35, 113 S.Ct. 2475, 125 L.Ed.2d 22 (1993)). None of the other cases cited by Defendant hold otherwise, and any broad language quoted from their opinions goes only to the same point as *Farmer:* that a defendant cannot be held liable for failure to perceive any risk at all. *See Perez v. Oakland Cnty.,* 466 F.3d 416, 424 (6th Cir.2006) (holding that plaintiff must "show that Rice was aware of a serious medical need (his mental illness as manifested in suicide risk)" only, rather than awareness of specific diagnosis of mental illness); *Horn v. Madison Cnty. Fiscal Court,* 22 F.3d 653, 660 (6th Cir. 1994) (upholding dismissal of claim where "none of the named defendants had actual or constructive knowledge of [plaintiff's] suicidal propensity"); *Gibson v. Foltz,* 963 F.2d 851, 854 (6th Cir.1992) ("There was no evidence that the defendants knew that Gibson was in danger."); *McGhee v. Foltz,* 852 F.2d 876, 881 (6th Cir.1988) (finding claim insufficient where defendant "had no notice or knowledge of any danger to the plaintiff").

 Thus, the question here is whether Dr. Abdellatif was aware of, or had inferred that there was, a substantial risk to Mr. Jones's health, not that he had identified the correct source of that risk out of the range of possible diagnoses. Defendant does not seriously dispute this point. A serious medical need is "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Harrison v. Ash,* 539 F.3d 510, 518 (6th Cir.2008) (citing *Blackmore v. Kalamazoo Cnty.,* 390 F.3d 890, 897 (6th Cir.2004)).

Dr. Abdellatif saw enough of a risk to send Mr. Jones to the hospital on three separate occasions. Among other indications of his acknowledgment of the risk to Mr. Jones, his notes indicate that on the first examination he suspected Mr. Jones of a "brain pathology" (Medical Record, ECF No. 154, Ex. 1, at 19), and before the second emergency room visit, he stated, "I feel it is not safe to keep [Mr. Jones] in prison." (*Id.* at 25.) The facts here are sufficient to support a finding that he was in fact aware of Mr. Jones's serious medical need.

### 4. Disregard

More on-point is Defendant's argument that Dr. Abdellatif was not indifferent to Mr. Jones's plight: "Dr. Abdellatif provided [Mr. Jones] with reasonable medical care for [the] symptoms [he] presented with, and he reasonably deferred to the consulting medical specialists at the hospitals to properly diagnose and treat Mr. Jones." (Def.'s Br., ECF No. 139, at 14.) These referrals, on their own, will not protect Dr. Abdellatif. *See LeMarbe v. Wisneski,* 266 F.3d at 439 ("Similarly, the fact that Dr. Wisneski eventually referred LeMarbe to a specialist does not automatically immunize Dr. Wisneski from liability for LeMarbe's intervening injuries. For, as many federal courts have recognized, a deliberately indifferent delay in giving or obtaining treatment may also amount to a violation under the Eighth Amendment."). The real question here is, as Defendant puts it, the reasonableness of Dr. Abdellatif's actions—whether he "consciously disregarded" Mr. Jones's needs, *id.,* or provided Mr. Jones with "grossly inadequate"

care, *Terrance,* 286 F.3d at 843. *See also Farmer,* 511 U.S. at 844–45, 114 S.Ct. 1970 ("[P]rison officials who act reasonably cannot be found liable under the Cruel and Unusual Punishments Clause.").

Plaintiff alleges that Dr. Abdellatif's care was "cursory . . . at best" and constituted deliberate indifference. Specifically, Plaintiff focuses on the following aspects of Mr. Jones's care: (1) Dr. Abdellatif's decision to send Mr. Jones to the hospital on September 11 without any accompanying medical information indicating his history or Dr. Abdellatif's suspicions and reasons for sending him; (2) Dr. Abdellatif's failure to see Mr. Jones after he returned from the emergency room on September 11; (3) Dr. Abdellatif's failure to review the emergency room's test results on September 12; (4) Dr. Abdellatif's decision to send Mr. Jones back to the emergency room on September 12, again without any accompanying medical information;[7] and (5) Dr. Abdellatif's failure to have Mr. Jones admitted to the hospital for two days after he was returned from the emergency room for a third time. Dr. Abdellatif's care, Plaintiff argues, was grossly inadequate, and his failures caused "unreasonable delay" in providing Mr. Jones with critical care.

Defendant counters that Plaintiff's case amounts to nothing more than a claim of negligence or medical malpractice. Mr. Jones was given medication for his symptoms as he presented them. He was sent to the hospital four times—three by Dr. Abdellatif himself, each promptly after he saw Mr. Jones—and examined each time he returned. No one who saw Mr. Jones

---

7. As noted above, there is some dispute about whether Dr. Abdellatif actually talked to the emergency room doctor before sending Mr. Jones back to the hospital. Interpreting the factual discrepancy here is a matter for the jury, however, and for purposes of this mo-

tion, this court views the evidence in the light most favorable to the plaintiff. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

was able to properly diagnose him until he was finally admitted—on Dr. Abdellatif's insistence—to the hospital on September 14. According to Defendant, Plaintiff's complaints show simply a difference of opinion regarding the proper treatment of a patient presenting Mr. Jones's symptoms, rather than a case of deliberate disregard of a patient's needs.

 Defendant is correct that Plaintiff needs to establish more than a simple medical malpractice claim. *See Comstock v. McCrary*, 273 F.3d 693, 703 (6th Cir.2001) ("The requirement that the official have subjectively perceived a risk of harm and then disregarded it is meant to prevent the constitutionalization of medical malpractice claims."). In disputes "over the adequacy of the treatment, federal courts are generally reluctant to second guess medical judgments." *Westlake v. Lucas*, 537 F.2d 857, 860 n. 5 (6th Cir.1976). But at the same time, "[a] government doctor has a duty to do more than simply provide some treatment to a prisoner who has serious medical needs." *LeMarbe*, 266 F.3d at 439. The distinction between deliberate indifference or reckless disregard and a mere dispute over the adequacy of treatment is a fine one, and discussion of this circuit's opinions will help delineate the difference.

In *Comstock v. McCrary*, the Sixth Circuit allowed a Section 1983 claim to go forward against a prison psychologist. 273 F.3d at 704. *Comstock* involved a prisoner who had committed suicide after being removed from "close observational status, or 'suicide watch.'" *Id.* at 698–99. The court found that the prison psychologist's decision to take the prisoner off of close observational status had been based on a "facial[ly] inadequa[te]" 30–minute conversation, as the psychologist had not reviewed the patient's medical records, talked to the patient's other psychologists,

reviewed the prison guards' records, or taken any of several additional steps that would have improved his evaluation of the patient. *See id.* at 706–08. The psychologist's "failure to perform one, or even some," of these steps took the case from mere negligence into reckless indifference. *Id.* at 709. Similarly, the court in *LeMarbe v. Wisneski*, 266 F.3d 429, 432 (6th Cir.2001), allowed a claim to go forward where a patient's treating surgeon found five liters of bile in the patient's abdomen, but sewed him up after he and another doctor were unable to find the source of the leak. *Id.* at 433. Though the surgeon examined the patient several times afterward, the court found that he had "clearly acted with a conscious disregard" for the patient's health. *Id.* at 439.

The case of *McCarthy v. Place*, 313 Fed. Appx. 810, 816 (6th Cir.2008), provides a closer example of facts that will and will not support a finding of deliberate indifference. In that case, Mr. McCarthy needed two teeth pulled and at least one cavity filled. *Id.* at 811. His dentist scheduled the two teeth to be pulled individually and in separate operations, with the fillings to take place afterward. *Id.* In the end, it took seven months to complete the work. In the meantime, the dentist gave McCarthy ibuprofen for his tooth pain. The Sixth Circuit held that the dentist's decision to schedule the treatments sequentially was not deliberate indifference, but the decision to give McCarthy only ibuprofen in the meantime did present a triable issue of fact. *Id.* at 815–16. The dentist had stated that he scheduled the treatments sequentially because the teeth were on different sides of the mouth, and otherwise McCarthy would not be able to chew after the operation. *Id.* The court found that this reasoning "demonstrates that [the dentist] did not recklessly disregard the substantial pain that McCarthy was in

when he chose this course of action." *Id.* at 816. On the other hand, the doctor's decision to give McCarthy ibuprofen was not similarly supported by a considered weighing of the options. The court found that the doctor could have temporarily filled McCarthy's tooth while the other operations were pending. Without any evidence that the dentist had considered and reasonably rejected this option, the court found that this choice could show deliberate indifference to McCarthy's significant tooth pain. *Id.*

On the other side of the issue, the court in *Jones v. Muskegon County*, 625 F.3d 935, 938 (6th Cir.2010), affirmed the district court's dismissal of a claim against a detainee's doctor. The detainee had been complaining about abdominal pain for months when his nurses asked the doctor to examine him. Though the patient had lost over 40 pounds, the doctor diagnosed him with constipation and gave him a laxative. *Id.* at 939. The detainee was examined repeatedly over the next several days before he was taken to the hospital, where exploratory surgery uncovered a cancerous tumor. The patient died shortly thereafter. *Id.* Though the doctor's initial treatment "seem[ed] inappropriate" to the court, it noted that the patient did have several symptoms that were consistent with that diagnosis. *Id.* at 945. Mere negligence in diagnosis is not actionable indifference, the court noted, and the doctor did schedule various follow-up exams and transferred the patient to the hospital "when it was apparent that his condition was worsening." *Id.* In light of these facts, the court found that the doctor's conduct did not constitute deliberate indifference. *Id.* Another instructive case is *Williams v. Mehra*, 186 F.3d 685 (6th Cir. 1999). The psychiatrist—defendants in *Williams* chose to use a "pill line" to medicate a suicidal patient, in an attempt to prevent him from overdosing. *Id.* at 688–

89. Though the patient did indeed end up overdosing on a stockpile of pills, the Court found that the doctors' decision did not constitute deliberate indifference. The doctors did in fact recognize the risk to the patient and made a deliberate decision to use a pill line to try to stop him from hoarding pills. *Id.* at 692. "There is nothing to suggest that the doctors were failing to treat [the patient] or doing less than their training indicated was necessary." *Id.*

Both the *Comstock* and *LeMarbe* panels expressly distinguished their cases from *Williams*. Whereas *Williams* involved a choice of "one medically reasonable form of treatment over another," the *Comstock* psychologist's cursory evaluation was a simple failure to "respond reasonably to the substantial risk of harm." *Comstock*, 273 F.3d at 710. Similarly, *LeMarbe* involved evidence that the doctor knew that a continuing bile leak could be dangerous, whereas *Williams* involved no evidence that the doctors knew that pill lines were less effective at preventing hoarding than using liquid medication. *LeMarbe*, 266 F.3d at 439–40. That is, "LeMarbe has raised more than just a simple question of whether Dr. Wisneski made the right medical judgment in treating him." *Id.* at 439.

Comparing these cases demonstrates a common principle used to distinguish deliberate indifference from a matter of medical judgment that does not rise to a constitutional violation. Where the defendant made a reasoned choice between two alternative treatments, considering the risk to the patient in doing so, the courts typically refuse to second-guess the doctor's judgment, even when the decision was in fact wrong. *See Williams*, 186 F.3d at 692; *Durham v. Nu'Man*, 97 F.3d 862, 868–69 (6th Cir.1996) (rejecting claim against doctor for failing to order X-ray

for several days when patient's arm, though actually broken, was not swollen); *Bright v. Martin,* 37 Fed.Appx. 136, 138 (6th Cir.2002) (rejecting claim where patient "received medical treatment for many years while incarcerated and has now concluded that he has a liver condition which Dr. Messany did not treat properly"); *Love v. Taft,* 30 Fed.Appx. 336, 337–338 (6th Cir.2002) (similar); *Powell v. Messary,* 11 Fed.Appx. 389, 390 (6th Cir.2001) (rejecting claim that medical treatment provided was ineffective); *see also Comstock,* 273 F.3d at 710 (distinguishing case from *Estelle v. Gamble,* 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976), and *Williams,* where defendant "chose one medically reasonable form of treatment over another").

On the other hand, where the defendant failed to consider more effective alternatives or where the alleged shortcoming involved violations of protocol or failures of process—that is, when there was no "medical judgment" to speak of—the courts give less deference to the medical treatment provider. *See, e.g., Phillips v. Roane Cnty.,* 534 F.3d 531, 536, 544 (6th Cir.2008) (allowing claim to proceed against doctor who knew of patient's prior collapse, violated protocol in not taking her to the hospital, and failed to follow up for test he had ordered, and whose medical records were unacceptable and examination was cursory); *Gibson v. Moskowitz,* 523 F.3d 657, 662–63 (6th Cir.2008) (upholding jury's finding of deliberate indifference where psychiatrist failed to remove prisoner from 90–100–degree room, despite concerns of dehydration and nurse's repeated requests for him to examine prisoner for dehydration); *Perez v. Oakland Cnty.,* 466 F.3d 416, 424–25 (6th Cir.2006) (allowing claim to go forward where caseworker moved patient to single-cell housing without requesting medical judgment from doctor regarding suicide risk).

Plaintiff's claims in this case allege failures of process: Dr. Abdellatif's failure to review the emergency room's test results; his repeatedly sending Mr. Jones to the hospital without medical records or even a note indicating a reason; and his failure to see Mr. Jones promptly either time he was returned from the emergency room. These claims are more akin to the "cursory evaluation" cases than to the substantive medical decisions of *Jones* and *Williams.* As in *Comstock, Phillips,* and *Perez,* this case involves a medical provider who allegedly failed to take a variety of administrative acts that would have significantly improved Mr. Jones's medical care. Defendant claims no reasonable difference of opinion regarding whether doctors should read their patients' test results or whether they should send medical records or notes along with their patient to the hospital. This is not a debate over the proper course of treatment for Mr. Jones. It is a question of whether Dr. Abdellatif's failure to perform these actions constituted deliberate indifference to Mr. Jones's admittedly serious condition—whether Dr. Abdellatif was effectively "failing to treat" Mr. Jones or "doing less than [his] training indicated was necessary." *Williams,* 186 F.3d at 692. Though, as Defendant notes, Dr. Abdellatif did send Mr. Jones to the hospital repeatedly, this does not settle the question. Plaintiff provides both factual evidence and expert testimony regarding whether the treatment Mr. Jones received met applicable standards of care. (*See, e.g.,* Walden Expert Rep., ECF No. 154, Ex. 11.) Taking this evidence in the light most favorable to Plaintiff, as we must in deciding this motion, the court finds that Plaintiff has shown a triable question of fact regarding whether Dr. Abdellatif's treatment of Mr. Jones displayed deliberate indifference.

### 5. Proximate Cause

Defendant also argues that Plaintiff's claim should be dismissed because she has failed to show that Dr. Abdellatif's inaction or delay proximately caused Mr. Jones's death, as the Sixth Circuit required in *Napier v. Madison County*, 238 F.3d 739, 742 (6th Cir.2001). (Def.'s Br., ECF No. 139, at 16.)

■■■ But *Napier* did not, as Defendant suggests, establish a free-floating requirement of proximate cause in "deliberate indifference" cases. The Sixth Circuit has clearly cabined the *Napier* rule's scope to "cases involving only 'minor maladies or non-obvious complaints of a serious need for medical care.'" *Estate of Carter v. City of Detroit*, 408 F.3d 305, 312 (6th Cir.2005) (citing *Blackmore v. Kalamazoo Cnty.*, 390 F.3d 890, 898 (6th Cir.2004)). Where a patient's serious medical issue is sufficiently obvious, the Plaintiff is not required to submit evidence that delay actually harmed him. *Blackmore*, 390 F.3d at 899–900 ("In a word, *Napier* does not apply to medical care claims where facts show an obvious need for medical care that laymen would readily discern as requiring prompt medical attention by competent health care providers.").

As noted above, three other prisoners at the Ernest Brooks Facility have signed affidavits regarding Mr. Jones's apparent physical condition during his illness. These affidavits attest that during this time, Mr. Jones "appear[ed] to be losing control of his muscles, losing weight rapidly, [and] becoming very weak and unable to walk" (Reinstra Aff., ECF No. 154, Ex. 10); that he "looked malnourished, pale, weak and sickly" and "appeared to be getting worse" (Mazurek Aff., *id.*); and that he "stopped going to meals and appeared to stop eating his meals" (Hawkins Aff., *id.*), among other things. All three inmates stated their willingness to testify that Mr. Jones appeared to them to be seriously ill and in need of urgent medical assistance. (*Id.*) Combined with the nurses' and doctor's notes on Mr. Jones's medical record discussed above, these affidavits, read in the light most favorable to Plaintiff, sufficiently raise a question of fact as to whether Mr. Jones's medical need was sufficiently obvious to make *Napier* evidence unnecessary. The court therefore declines to grant summary judgment on this ground.

### E. Plaintiff's Gross Negligence Claim Against Dr. Abdellatif

Defendant Abdellatif also asks the court to dismiss Plaintiff's gross negligence claim (Count III) against him, based on Plaintiff's failure to state a claim upon which relief can be granted. *See* Fed. R.Civ.P. 12(b)(6). Michigan law sets out various requirements for "malpractice" claims, including written, pre-suit notice, Mich. Comp. L. § 600.2912b, and the filing of an "affidavit of merit" signed by a medical health professional along with the complaint, Mich. Comp. L. § 600.2912d. Defendant argues that Plaintiff's claim, though purporting to be based on "gross negligence," is in actuality a medical malpractice claim and so is subject to Michigan's procedural requirements. (Def.'s Br., ECF No. 139, at 17–19.) Because Plaintiff failed to follow these requirements, Defendant argues, her claim must be denied under Rule 12(b)(6).

#### 1. The Character of Plaintiff's Claim

■■■ The first issue here is whether Plaintiff's claim must in fact be treated as a medical malpractice claim. To begin with, the Complaint itself is not entirely consistent about whether Count III is based on state or federal law. The claim is titled "GROSS NEGLIGENCE" and states that defendants' "acts and/or omissions and/or conduct ... constitute gross

negligence ... under the laws of the State of Michigan." (First Am. Compl., ECF No. 44, at 18.) But it also states that "defendants have deprived plaintiff's decedent of the rights secured by the Eighth Amendment to the United States Constitution, in violation of 42 U.S.C. § 1983." (*Id.* at 19.) At least one other district court has found that a similarly ambiguous claim pleaded a federal, constitutional claim rather than a state-law claim. *See Hagopian v. Smith,* No. 05–74025, 2008 WL 3539256, at *4–5 (E.D.Mich. Aug. 12, 2008) (construing claim titled "Gross Negligence, Wilful and Wanton Misconduct of All Individual Defendants" but alleging "violation of Plaintiff's Constitutional Rights"). This claim is less ambiguous than that in *Hagopian,* however, both due to its repeated statements about Michigan law and because Plaintiff's complaint alleges its constitutional claims separately, under Counts I and II. (*See* First Am. Compl., ECF No. 44, at 11–18.) This court finds little difficulty in construing this claim as one brought under Michigan law and not federal constitutional grounds.

Michigan's Government Tort Liability Act sets out "gross negligence" as one exception to the general immunity it grants government employees. *See* Mich. Comp. L. § 691.1407(2) (granting immunity so long as employee's "conduct does not amount to gross negligence that is the proximate cause of the injury or damage"). But as noted above, Michigan statutes also set out various requirements for medical malpractice claims, left largely undefined in the statute. *See* Mich. Comp. L. §§ 600.2912–2912h. The parties dispute whether this claim is merely a one of gross negligence, not subject to Michigan's additional malpractice requirements, or whether it is actually a malpractice claim, to which the additional requirements may apply (as discussed further below).

Under *Erie R.R. Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), a federal court deciding a state-law claim applies the state law for all substantive issues and federal law for procedural issues. *See also Felder v. Casey,* 487 U.S. 131, 151, 108 S.Ct. 2302, 101 L.Ed.2d 123 (1988) (applying *Erie* doctrine to pendent claims). Whether a claim sounds under state-law gross negligence or state-law medical malpractice is clearly a substantive issue to which Michigan law applies. This court will thus look to the Michigan courts' treatment of similar claims for guidance on this issue.

The courts of the State have held that the substance of a claim, rather than the words in which the claim is couched, determines whether it is in fact a malpractice claim subject to the statutory requirements. *See Dorris v. Detroit Osteopathic Hosp. Corp.,* 460 Mich. 26, 594 N.W.2d 455, 464 (1999) ("[A] complaint cannot avoid the application of the procedural requirements of a malpractice action by couching its cause of action in terms of ordinary negligence." (modification in original; quotation marks omitted)); *Adam v. Sisters of Bon Secours Nursing Care Ctr.,* No. 2007–001381, 2011 WL 3903146, *4 (Mich.Ct. App. Sept. 6, 2011) (holding gross negligence claim subject to malpractice requirements).

The Michigan Supreme Court has enumerated two key aspects that distinguish malpractice claims. First, the alleged negligence must have "occurred within the course of a professional relationship." *Dorris,* 594 N.W.2d at 465. That is, a "licensed health care professional, licensed health care facility, or the agents or employees of a licensed health care facility, were subject to a contractual duty that required that professional, that facility, or the agents or employees of that facility, to render professional health care

services to the plaintiff." *Bryant v. Oakpointe Villa Nursing Ctr.*, 471 Mich. 411, 684 N.W.2d 864, 871 (2004). Plaintiff's First Amended Complaint meets this factor by alleging that Dr. Abdellatif was "under contract with defendant Correctional Medical Services to provide medical care to the inmates of the Michigan Department of Corrections." (First Am. Compl., ECF No. 44, at 5.)

Second, the facts of a malpractice claim "raise questions involving medical judgment," rather than "issues that are within the common knowledge and experience of the jury." *Dorris*, 594 N.W.2d at 465. Where "the reasonableness of the action can be evaluated by a jury only after having been presented the standards of care pertaining to the medical issue before the jury explained by experts, a medical malpractice claim is involved." *Bryant*, 684 N.W.2d at 872. The courts have held that issues so attenuated from direct medical treatment as supervision and staffing decisions fall under the malpractice rules. *See, e.g., id.* (staffing and patient monitoring); *Bronson v. Sisters of Mercy Health Corp.*, 175 Mich.App. 647, 438 N.W.2d 276 (Mich.Ct.App.1989) (supervision and staffing decisions); *Waatti v. Marquette Gen'l Hosp.*, 122 Mich.App. 44, 329 N.W.2d 526 (Mich.Ct.App.1982) (whether seizure patient needs constant medical supervision); *Starr v. Providence Hosp.*, 109 Mich.App. 762, 312 N.W.2d 152 (Mich.Ct.App.1981) (adequate supervision). On the other hand, a claim that defendant did nothing in response to a known risk is a matter of negligence, not malpractice. *See Bryant*, 684 N.W.2d at 875 ("No expert testimony is necessary to determine whether defendant's employees should have taken some sort of corrective action"; "[t]he fact-finder can rely on common knowledge and experience.").

The issues involved in this claim are not so completely settled that a jury can decide them based only on common knowledge and experience. Plaintiff alleges that Defendants breached their duty by, among other things, "failing to present decedent to [a] qualified medical provider," "failing to obtain vital signs, administer prescribed medications, [and] notify qualified medical professionals of decedent's deteriorating condition in order to obtain timely diagnosis and treatment of an otherwise treatable disease." (First Am. Compl., ECF No. 44, at 18.) These issues—whether defendants negligently failed to present Mr. Jones to a "qualified medical provider" or to diagnose him in a timely manner, let alone whether his disease was in fact "otherwise treatable"—are clearly issues that will require expert testimony for all but the most medically proficient factfinder to decide. *See also Sibley v. Borgess Med. Ctr.*, 2008 WL 2744618, *3 (Mich.Ct.App.2008) (finding that whether nursing staff conveyed appropriate information to treating physicians involved question of medical judgment).

Michigan law does not, as Plaintiff implies, allow a claim sounding in medical malpractice to be brought as a "gross negligence" claim under the Government Tort Liability Act, Mich. Comp. L. § 691.1407. Instead, the courts appear to recognize that both governmental immunity and the malpractice requirements can apply to a plaintiff's claim. *See Costa v. Cmty. Emergency Med. Servs., Inc.*, 475 Mich. 403, 716 N.W.2d 236 (2006). In *Costa*, the plaintiff brought a medical malpractice claim against defendants, who alleged immunity under the Government Tort Liability Act, Mich. Comp. L. § 691.1407. Plaintiff countered that because he alleged gross negligence, immunity did not attach; further, because defendants failed to file affidavits of meritorious defense, as re-

quired by Mich. Comp. L. § 600.2912e, he was entitled to summary judgment on his claims. *Id.* at 238. The Michigan Supreme Court thus had to determine whether—and if so, how—the malpractice requirements and government-immunity statute applied to this malpractice-with-gross-negligence claim. The court found for defendants, holding that the affidavit of merit requirement applied, but only if the court first determined that defendants were not entitled to immunity. *Id.* at 242. That is, if the facts surrounding plaintiff's malpractice claim did in fact establish gross negligence, then defendants would not be immune and would then be subject to the malpractice requirements under Michigan law.

The *Costa* court did not ignore the malpractice requirements simply because plaintiff alleged gross negligence; nor did it ignore the immunity statute because the claim was one for malpractice. Instead, the court applied both laws, acknowledging that though gross negligence is not required for an ordinary malpractice claim, an allegation (and proof) of gross negligence is necessary to overcome a defendant's government-immunity defense. *Id.* at 240–41. Gross negligence here was not a separate claim, but an "additional showing" that plaintiff must make in order to impose liability on such a defendant. *Id.* at 241.

▮ Though *Costa* is not precisely on point with this case—for instance, the parties there appear to have conceded that plaintiff's claim was one for malpractice—

the decision is clearly applicable here. The court's analysis shows that malpractice claims and "gross negligence" claims exempt from government immunity are not distinct sets of legal actions, as Jones argues. Rather, when a plaintiff brings an action sounding in medical malpractice—as *Dorris* and the other cases discussed above make clear is the case with Jones's claim—both sets of laws apply, with potential conflicts worked out based on standard principles of statutory interpretation. Jones's allegation of gross negligence is thus relevant to any potential claims of governmental immunity under Mich. Comp. L. § 691.1407, but it does not take this claim out of the realm of malpractice.[8]

As such, this court finds that Plaintiff's "gross negligence" claim sounds under medical malpractice for purposes of Michigan law. This finding does not complete the analysis, however.

### 2. The Applicability of Michigan's Statutory Requirements

As discussed above, Michigan's malpractice requirements only apply to this federal action if they are substantive in nature under *Erie* and its progeny. If instead the requirements are procedural in nature, they do not apply in federal court.

▮ The parties spend significant time discussing various Michigan decisions that have called these rules "substantive" or "procedural." But the federal courts are not bound to follow a state's own characterization of its rule in determining whether to apply a state law under *Erie*, particu-

---

**8.** The district court case of *Beedle v. Doane*, No. 05–cv–70430, 2005 WL 1345527 (E.D.Mich. May 12, 2005), cited by Plaintiff, does not compel a contrary result. Though the magistrate judge in *Beedle* did decline to apply the malpractice requirements to a claim framed as gross negligence, *see id.* at *5, nothing in this opinion suggests that the court actually considered the substance of the

claim, as required by Michigan law, in determining its nature. Further, *Beedle* was decided *before* the Michigan Supreme Court released its opinion in *Costa* making clear that the Government Tort Liability Act and the state's malpractice requirements can in fact be reconciled. That decision, not *Beedle*, controls the issue here.

larly when those characterizations arise in a non-*Erie* context. *See Byrd v. Blue Ridge Rural Elec. Co-op., Inc.,* 356 U.S. 525, 550, 78 S.Ct. 893, 2 L.Ed.2d 953 (1958) ("It is therefore immaterial whether (state-created rights) are characterized either as 'substantive' or 'procedural' in State court opinions in any use of those terms unrelated to the specific issue before us.") (quoting *Guaranty Trust Co. v. York,* 326 U.S. 99, 109, 65 S.Ct. 1464, 89 L.Ed. 2079 (1945)); *see also Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.,* —— U.S. ——, 130 S.Ct. 1431, 1469, 176 L.Ed.2d 311 (2010) (Ginsburg, J., dissenting) (listing examples where federal courts refused to follow state characterizations of rules). We must, therefore, evaluate Michigan's requirements independently, according to the applicable legal standard.

### a. The applicable legal standard

 Under *Erie,* the federal courts are to apply state substantive law and federal procedural law. As it became clear that in many cases, no clean distinction could be made between substance and procedure, the Supreme Court refined this test, eventually settling on a functional inquiry based on the "twin aims of the *Erie* rule: discouragement of forum-shopping and avoidance of inequitable administration of the laws." *Hanna v. Plumer,* 380 U.S. 460, 468, 85 S.Ct. 1136, 14 L.Ed.2d 8 (1965). The key question, according to *Hanna,* is "whether application of the [state] rule would make so important a difference to the character or result of the litigation that failure to enforce it would unfairly discriminate against citizens of the forum State, or whether application of the rule would have so important an effect upon the fortunes of one or both of the litigants that failure to enforce it would be likely to cause a plaintiff to choose the federal court." *Id.* at 468 n. 9, 85 S.Ct. 1136. If so, then the federal court should

apply the state rule, as it is effectively "substantive." If not, then the state rule is "procedural" and does not apply. *Id.;* *see Preferred Capital, Inc. v. Sarasota Kennel Club, Inc.,* 489 F.3d 303, 308 (6th Cir.2007).

This analysis was considered "relatively unguided" in 1965, *Hanna,* 380 U.S. at 471, 85 S.Ct. 1136, and it is not much better today. *See, e.g., Shady Grove,* 130 S.Ct. at 1437. But the courts do not "wade into *Erie's* murky waters" unless we need to. *Id.* Under the Rules Enabling Act, 28 U.S.C. § 2072, the Supreme Court is authorized to enact procedural rules for the federal courts. In *Hanna,* the Court held that so long as these Federal Rules are valid, they control over conflicting state laws, regardless of what the *Erie* analysis would say about those laws. *See Shady Grove,* 130 S.Ct. at 1437; *Hanna,* 380 U.S. at 471, 85 S.Ct. 1136. This adds a preliminary step to the analysis: first determine whether the state law conflicts with a valid Federal Rule of Civil Procedure, and only evaluate the *Hanna* factors if there is no conflict.

The word "conflict" works complexity out of this clear-seeming test, however. While early Supreme Court decisions indicated that a "direct collision" was necessary to trigger the Rules Enabling Act analysis, *see Hanna,* 380 U.S. at 472, 85 S.Ct. 1136, more recent opinions have clarified that this language is not as narrow as it may appear; a conflict occurs where the federal rule is "sufficiently broad to control the issue before the Court." *Shady Grove,* 130 S.Ct. at 1437; *see also Stewart Org., Inc. v. Ricoh Corp.,* 487 U.S. 22, 108 S.Ct. 2239, 101 L.Ed.2d 22 (1988) ("this ['direct collision'] language is not meant to mandate that federal law and state law be perfectly coextensive and equally applicable to the issue at hand").

■ Conflicts can be implicit, as where a state law requires in-hand service on the executor of an estate, but the Federal Rule provides for more lenient methods of service. *See Hanna*, 380 U.S. at 470, 85 S.Ct. 1136 ("[T]he clash is unavoidable.... Rule 4(d)(1) says—implicitly, but with unmistakable clarity—that in-hand service is not required in federal courts."). But the courts also look to the actual effect of the rule at issue; provisions do not conflict solely because they use similar language. For instance, in *Walker v. Armco Steel Corp.*, the Supreme Court found no conflict between Fed R. Civ. P. 3, which deems an action commenced at the time plaintiff files her complaint, and an Oklahoma statute providing that an action is commenced upon service of summons to the defendant. 446 U.S. 740, 752, 100 S.Ct. 1978, 64 L.Ed.2d 659 (1980). Though both provisions referred to "commencement" of suit, they actually operated in different spheres: the Oklahoma statute dealt with the statute of limitations, whereas the federal commencement date was only intended to start the clock running for various other federal deadlines. *Id.* at 750–51, 100 S.Ct. 1978. "There is no indication that the Rule was intended to toll a state statute of limitations, much less that it purported to displace state tolling rules for purposes of state statutes of limitations." *Id.*

The courts also find conflict where a state law limits a court's discretion under the Federal Rules. *Burlington Northern Railroad Co. v. Woods* involved an Alabama statute that imposed a mandatory ten-percent penalty on an appellant-defendant who had obtained a stay on judgment and subsequently lost his appeal. 480 U.S. 1, 7–8, 107 S.Ct. 967, 94 L.Ed.2d 1 (1987). The Supreme Court held that this provision conflicted with Rule 38 of the Federal Rules of Appellate Procedure, which gives the court of appeals discretion to punish appellants who bring frivolous appeals.

Not only did the two provisions serve the same purpose—compensating victorious appellees and deterring frivolous appeals—but they did so in mutually exclusive ways. "Federal Rule 38 adopts a case-by-case approach," whereas "the Alabama statute precludes any exercise of discretion within its scope of operation." *Id.* at 8, 107 S.Ct. 967. Because a federal court applying the Alabama statute would be unable to exercise its discretion to penalize the losing party in an amount less than ten percent, the statute "unmistakably" conflicted with Rule 38. *Id.* at 7, 107 S.Ct. 967. *See also Stewart Org., Inc. v. Ricoh Corp.*, 487 U.S. 22, 31, 108 S.Ct. 2239, 101 L.Ed.2d 22 (1988) (finding conflict between Alabama law that gives no effect to contractual forum-selection clauses and federal statute that allows transfer based on weighing of many factors, including forum-selection clauses).

The Supreme Court has repeatedly stated that the "Federal Rules should be given their plain meaning" in determining whether they control the issue at hand. *See, e.g., Walker*, 446 U.S. at 750, 100 S.Ct. 1978 n.9 ("This is not to suggest that the Federal Rules of Civil Procedure are to be narrowly construed in order to avoid a 'direct collision' with state law."). But the Supreme Court's two most recent decisions appear to have reopened this issue to some extent, with one case expressly directing courts to "interpret[ ] the Federal Rules ... with sensitivity to important state interests and regulatory policies" and the other producing a fragmented set of opinions. *Gasperini v. Ctr. for Humanities*, 518 U.S. 415, 427 n. 7, 116 S.Ct. 2211, 135 L.Ed.2d 659 (1996); *see Shady Grove*, 130 S.Ct. 1431. A closer review of these two decisions will help clarify the principles that guide this court's conflict analysis.

*Gasperini v. Center for Humanities* involved a New York law instructing the appellate courts to order new trials when a jury's verdict "deviates materially from what would be considered reasonable compensation." 518 U.S. 415, 418, 116 S.Ct. 2211, 135 L.Ed.2d 659 (1996). The question before the Court was whether this rule conflicted with the Seventh Amendment and Rule 59, which allow new trials only as they had traditionally been granted under the common law and which do not permit the appellate courts to act as factfinder. The five Justice majority, led by Justice Ginsburg, found no conflict. It interpreted the New York law as a substantive limitation on the size of jury awards, though the law was framed as an instruction to the appellate courts. *Id.* at 429–49, 116 S.Ct. 2211. Emphasizing the need to "interpret[ ] the Federal Rules ... with sensitivity to important state interests and regulatory policies," *id.* at 427 n. 7, 116 S.Ct. 2211, the majority found that "the principal state and federal interests can be accommodated" without disrupting the federal system. *Id.* at 437, 116 S.Ct. 2211. The majority did so by giving the federal *district* courts, rather than the appellate courts, responsibility for implementing the "deviates materially standard." *Id.* This compromise, the majority found, both satisfies the Constitution and implements the core of the standard that New York's legislature adopted.[9]

·The dissenting Justices disagreed, arguing that Rule 59 directly conflicted with the New York rule. The New York law, they found, is not a substantive limit on damages; by its very text, it sets out a standard by which the courts were to review and overturn jury awards. *Id.* at 464–

65, 116 S.Ct. 2211 (Scalia, J., dissenting) ("There is an absolutely fundamental distinction between a *rule of law* such as that, which would ordinarily be imposed upon the jury in the trial court's instructions, and a *rule of review,* which simply determines how closely the jury verdict will be scrutinized for compliance with the instructions."). Rule 59 also sets out a standard of review—one incompatible with New York's law. "It is simply not possible to give controlling effect both to the federal standard and the state standard in reviewing the jury's award. That being so, the court has no choice but to apply the Federal Rule." *Id.* at 468, 116 S.Ct. 2211 (Scalia, J., dissenting).

The *Gasperini* majority and minority disagreed not just in their characterizations of the state law, but also in the more abstract issue of the extent to which the Federal Rules should be interpreted flexibly to avoid conflict. The majority, inclined to accommodate the federal and state interests if possible, emphasized the need to "interpret[ ] the Federal Rules ... with sensitivity to important state interests and regulatory policies." *Id.* at 427 n. 7, 116 S.Ct. 2211. Justice Scalia's dissent, however, took the competing rules at face value, allowing no room for reinterpretation to avoid conflict. The dissent saw no reason for flexibility where "the Federal Rule is sufficiently broad to cause a direct collision with the state law or, implicitly, to control the issue before the court, thereby leaving no room for the operation of that law." *Id.* at 468, 116 S.Ct. 2211 (Scalia, J., dissenting) (quotation marks omitted).

This dispute arose again in the Supreme Court's most recent opinion in this area, *Shady Grove Orthopedic Associates, P.A.*

---

9. Justice Stevens agreed with much of the majority's analysis, though he formally dissented because he believed that the circuit court properly applied the correct standard, leaving no need to remand for the district court to repeat the exercise. *Id.* at 439, 441, 116 S.Ct. 2211 (Stevens, J., dissenting).

*v. Allstate Ins. Co.,* —— U.S. ——, 130 S.Ct. 1431, 176 L.Ed.2d 311 (2010). *Shady Grove* dealt with a New York statute prohibiting class-action suits seeking penalties or statutory minimum damages. In a fractured set of opinions, the Court found that this statute conflicted with Federal Rule 23, which sets out the requirements for bringing a class-action suit in federal court. Justice Scalia wrote the Court's lead opinion. He was joined in full by Chief Justice Roberts and Justice Thomas. Justice Sotomayor joined in part, and Justice Stevens joined in even smaller part, creating a majority for a portion of the opinion. Justice Stevens also wrote separately to explain his partial concurrence and concurrence in the judgment. Justice Ginsburg dissented, joined by Justices Kennedy, Breyer, and Alito.

Despite this multitude of positions, the Justices were cleanly divided on whether the New York statute conflicted with Rule 23. On this issue, a majority of the Court—Justices Stevens and Sotomayor both joined Justice Scalia's opinion here—found a direct conflict between the two provisions. *See id.* at 1441–42. Rule 23(b) states that a "class action may be maintained" if the four elements of subsection (a) are met and if the suit falls into one of three listed categories. The majority held that this rule directly controlled the issue of when plaintiffs can bring a class action, "provid[ing] a one-size-fits-all formula for deciding the class-action question." *Id.* at 1437. "Because [New York's statute] attempts to answer the same question—*i.e.,* it states that Shady Grove's suit 'may *not* be maintained as a class action' … because of the relief it seeks—it cannot apply in diversity suits" alongside Rule 23. *Id.* The majority refused to distinguish eligibility for class-action status from eligibility for class certification, finding this distinction "entirely artificial." *Id.* at 1438. It also dismissed the argument that New

York's statute affects only a class action's remedies, rather than the requirements for bringing the action in the first place. *Id.* at 1439–40. Finally, the majority addressed *Gasperini's* statement, repeated by the *Shady Grove* dissenters, that the Federal Rules should be read to avoid conflict with important state interests and policies. While the majority agreed with the narrower principle that a court should read an ambiguous rule to avoid substantial variations between state and federal litigation, it rejected *Gasperini's* broader proposition, calling the search for important state interests or policies a "standardless" inquiry. *Id.* at 1442 n. 7.

The dissent objected to the majority's "mechanical reading of Federal Rules," *id.* at 1464, instead emphasizing the need to "interpret Federal Rules with awareness of, and sensitivity to, important state regulatory policies." *Id.* at 1460 (Ginsburg, J., dissenting). Justice Ginsburg construed New York's statute as a limitation on remedy—the ability to recover damages on behalf of a class—rather than a requirement for class certification. *Id.* at 1465–66. That is, "while phrased as responsive to the question whether certain class actions may begin, § 901(b) is unmistakably aimed at controlling how those actions must end. On that remedial issue, Rule 23 is silent." *Id.* at 1467–68. According to the dissent, New York's law and Rule 23 have entirely different objectives: New York's limit is intended to prevent "annihilating punishment of the defendant," whereas Rule 23 attempts to identify the situations in which a class action would be an efficient use of resources. *Id.* at 1464–66 (quotation marks omitted). "Rule 23 describes a method of enforcing a claim for relief, while § 901(b) defines the dimensions of the claim itself." *Id.* at 1466. Therefore, Justice Ginsburg argued, there is no conflict here.

Justice Stevens joined Justice Scalia's opinion on the conflict issue, creating a majority for the parts of the opinion discussed above. He also concurred with Justice Scalia's conclusion that Rule 23 ultimately controlled over New York's law. *Id.* at 1448 (Stevens, J., concurring in part and concurring in the judgment). But he also agreed in principle with the dissenting Justices' command to interpret the federal rules flexibly (despite having joined the majority's discussion largely rejecting this approach). *Id.* at 1449.

Justice Stevens went even further, however, breaking from the other eight Justices' two-step analytical framework. For the other Justices, a state law that conflicts with a valid federal rule simply does not apply in federal court. Justice Stevens disagreed. In his view, the Rules Enabling Act, which provides that the federal rules cannot "abridge, enlarge or modify any substantive right," requires that the federal rules must give way to a state law that is substantive in nature. Where a state law is bound up in a "framework of substantive rights or remedies," that law is effectively substantive, even if it exerts its force through procedural levers. *Id.* at 1449. The federal rules cannot overrule such a law without "abridg[ing a] substantive right" and exceeding their authority. Thus, a conflicting federal rule must give way to such a substantively procedural state regulation.[10]

This rule, Justice Stevens cautioned, created a high bar. It would not often cause state procedural rules to override federal rules. "The mere fact that a state law is designed as a procedural rule suggests it reflects a judgment about how state courts ought to operate and not a

judgment about the scope of state-created rights and remedies." *Id.* at 1457. Adopting a procedure for "*some* policy reason" is not enough: "Although almost every rule is adopted for some reason and has some effect on the outcome of litigation, not every state rule 'defines the dimensions of [a] claim itself.'" *Id.* (quoting Ginsburg, J., dissenting) (alteration in original). In the situation at hand, Justice Stevens found that the New York statute was not effectively substantive in nature. The law "reflects a policy judgment about which lawsuits should proceed in New York in a class form and which should not," but this is not the same as "defin[ing] who can obtain a statutory penalty or ... enlarg[ing] New York's remedy." *Id.* Therefore, the statute was not intimately bound up in a substantive right, and Rule 23 controlled. *Id.* at 1459–60.

By and large, it is clear that Justice Stevens's opinion provides the narrowest grounds for the Court's decision. His vote provided a majority for the portions of Justice Scalia's opinion finding that the New York statute conflicts with Rule 23. He also agreed with the plurality's conclusion that Rule 23 satisfied the Rules Enabling Act (though under a different analysis). But Justice Stevens provided the dissent a fifth vote for the principle that federal rules should be construed with an eye toward their effects on state policies, though he disagreed "about the degree to which the meaning of federal rules may be contorted ... to accommodate state policy goals." *Id.* at 1451 n. 5 (quotation marks omitted). Therefore, his opinion is arguably the controlling one. *Marks v. United States*, 430 U.S. 188, 193, 97 S.Ct. 990, 51 L.Ed.2d 260 (1977) ("When a fragmented

---

**10.** Justice Stevens also acknowledged that the step of construing the federal rule was not as simple as it appeared. Because the federal rules should be construed, in some circumstances, to avoid conflict with a state's substantive policies, "the second step of the inquiry may well bleed back into the first." *Id.* at 1452.

Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds." (internal quotation marks omitted)).

But Justice Stevens stands alone in finding that conflict with a federal rule does not doom a state law that effects substantive goals by procedural aims. This puts *Shady Grove* into the set of cases where "*Marks* breaks down." *United States v. Cundiff,* 555 F.3d 200, 209 (6th Cir.2009) (discussing lack of clear controlling opinion in *Rapanos v. United States,* 547 U.S. 715, 126 S.Ct. 2208, 165 L.Ed.2d 159 (2006), where Court split 4–1–4 and opinions were not simply "logical subset[s]" of one another). But despite the difference in analytical framework, Justice Stevens's opinion still occupies a middle ground of sorts between the plurality's narrow view of the Rules Enabling Act's "substantive right[s]" clause and the dissent's broader view of that provision. *Compare Shady Grove,* 130 S.Ct. at 1442 ("We have long held that [the "shall not abridge, enlarge or modify any substantive right"] limitation means that the Rule must 'really regulat[e] procedure.'") (Scalia, J.), *with id.* at 1461 ("In interpreting the scope of the Rules ... we have been mindful of the limits on our authority [under the Rules Enabling Act].") (Ginsburg, J., dissenting). As such, Justice Stevens's opinion should be deemed controlling here too, until the Supreme Court can further clarify this issue.

■■■ This conclusion fits with those of other district courts in this circuit, which have also applied Justice Stevens's concurrence as the controlling opinion in *Shady Grove. See, e.g., In re Packaged Ice Antitrust Litig.,* 779 F.Supp.2d 642, 660 (E.D.Mich.2011) ("Courts interpreting the *Shady Grove* decision, and searching for guidance on this issue, have concluded that Justice Stevens' concurrence is the controlling opinion by which interpreting courts are bound."); *Kline v. Mortg. Elec. Sec. Sys.,* No. 3:08–cv–408, 2010 WL 6298271, *3 (S.D.Ohio Dec. 30, 2010) (similar); *McKinney v. Bayer Corp.,* 744 F.Supp.2d 733 (N.D.Ohio 2010); *Bearden v. Honeywell Int'l, Inc.,* No. 3:09–cv–1035, 2010 WL 3239285, *10 (M.D.Tenn. Aug. 16, 2010) ("Justice Stevens's concurrence is the controlling opinion").

### b. Affidavit of merit

■■■ First, we apply this framework to Michigan's "affidavit of merit" requirement. This statute requires that "the plaintiff's attorney shall file with the complaint an affidavit of merit signed by a health professional who the plaintiff's attorney reasonably believes meets the requirements for an expert witness." Mich. Comp. L. § 600.2912d(1). The health professional must describe the appropriate standard of care and provide her opinion regarding the defendant's failure to meet that standard. *Id.* Michigan originally enacted this provision in the 1980s as part of a larger set of tort reforms. *Ligons v. Crittenton Hosp.,* 490 Mich. 61, 803 N.W.2d 271, 277 (2011). The immediate purpose of the affidavit-of-merit requirement was "to deter frivolous medical malpractice claims by verifying through the opinion of a qualified health professional that the claims are valid." *Barnett v. Hidalgo,* 478 Mich. 151, 732 N.W.2d 472, 479 (2007) (citing *Scarsella v. Pollak,* 461 Mich. 547, 607 N.W.2d 711, 714 (2000)).

This type of provision is not unique to Michigan. Many states have passed similar certificate-of-merit or affidavit-of-merit requirements for malpractice claims. *See* Benjamin Grossberg, *Comment: Uniformity, Federalism, and Tort Reform: The Erie Implications of Medical Malpractice*

*Certificate of Merit Statutes*, 159 U. Pa. L.Rev. 217, 222–25 (2010) (surveying states and finding 25 with such requirements). Defendants seeking to apply these statutes in federal court have met with varying degrees of success, though a majority of courts—including all of the circuit courts to decide the question—have applied these requirements to federal actions.[11] As for Michigan's requirement, the federal district courts have split on this question, with the Western District applying Michigan's statute and the Eastern District declining to do so. *Compare Zappley v. Sharfenberg*, No. 2:08–cv–275, 2009 WL 2132727 (W.D.Mich. July 13, 2009), *and Lee v. Putz*, No. 1:03–cv–267, 2006 WL 1791304 (W.D.Mich. June 27, 2006), *with Long v. Adams*, 411 F.Supp.2d 701 (E.D.Mich.2006). Though these cases are not binding on this court, they will be considered as persuasive authority.

Though the courts have considered a number of potential conflicts between affidavits of merit and the Federal Rules, perhaps the most obvious involves the pleading requirements set out in Fed. R.Civ.P. 8 and 9. Rule 8 requires only that "[a] pleading which sets forth a claim for relief ... contain (1) a short and plain statement of the grounds upon which the court's jurisdiction depends ... (2) a short and plain statement of the claim showing that the pleader is entitled to relief, and (3) a demand for judgment for the relief the pleader seeks." Fed.R.Civ.P. 8(a). Rule 9 provides that certain issues and claims—not including malpractice claims— are subject to special pleading standards. Fed.R.Civ.P. 9. The Supreme Court has strictly enforced these pleading standards. In *Swierkiewicz v. Sorema N.A.*, the Court invalidated the rule, adopted by several circuits, that a plaintiff bringing a discrimination claim must plead the elements of a *prima facie* case. 534 U.S. 506, 512, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002). This requirement, the Court held, created a heightened pleading standard that conflicts with Rule 8. *Id.*

Under Mich. Comp. L. § 600.2912d(1), a malpractice plaintiff must file, along with

---

**11.** Cases applying affidavit-of-merit statutes include *Liggon–Redding v. Estate of Sugarman*, 659 F.3d 258, 262–65 (3d Cir.2011) (Pennsylvania statute); *Chamberlain v. Giampapa*, 210 F.3d 154, 164 (3d Cir.2000) (New Jersey statute); *Trierweiler v. Croxton and Trench Holding Corp.*, 90 F.3d 1523, 1540 (10th Cir.1996) (Colorado statute); *Williams v. United States*, 754 F.Supp.2d 942, 953 (W.D.Tenn.2010); *Lewis v. Ctr. for Counseling & Health Res.*, No. C08–1086 MJP, 2009 WL 2342459, at *6–7 (W.D.Wash. July 28, 2009); *Nicholson v. Catholic Health Partners*, No. 4:08–cv–2410, 2009 WL 700768, *3–5 (N.D.Ohio March 13, 2009); *Stanley v. United States*, 321 F.Supp.2d 805, 808 (N.D.W.Va. 2004); *Smith v. Planned Parenthood of St. Louis Region*, 225 F.R.D. 233, 239 (E.D.Mo. 2004); *Finnegan v. Univ. of Rochester Med. Ctr.*, 180 F.R.D. 247, 249 (W.D.N.Y.1998); *Hill v. Morrison*, 870 F.Supp. 978, 982 (W.D.Mo.1994); *Daley v. Lerner*, 1990 WL 43372, *3 (N.D.Ill. Mar. 29, 1990); *Oslund v. United States*, 701 F.Supp. 710 (D.Minn. 1988); *Thompson by Thompson v. Kishwaukee Valley Med. Grp.*, No. 86 C 1483, 1986 WL 11381, *1–2 (N.D.Ill. Oct. 6, 1986).

Cases refusing to apply these statutes include *Estate of C.A. v. Grier*, 752 F.Supp.2d 763, 771 (S.D.Tex.2010) (refusing to apply Texas affidavit-of-merit statute); *Garza v. Scott & White Mem'l Hosp.*, 234 F.R.D. 617, 622–23 (W.D.Tex.2005) (refusing to apply Texas statute requiring expert reports with specified content within 180 days of filing the complaint); *Poindexter v. Bonsukan*, 145 F.Supp.2d 800, 810 (E.D.Tex.2001) (same); *Baird v. Celis*, 41 F.Supp.2d 1358, 1361–62 (N.D.Ga.1999) (refusing to apply Georgia's statute because of conflict with Rule 8); *Braddock v. Orlando Reg'l Health Care Sys., Inc.*, 881 F.Supp. 580, 584 (M.D.Fla.1995) (refusing to apply Florida affidavit-of-merit statute because of conflict with Rule 8); *Boone v. Knight*, 131 F.R.D. 609, 611 (S.D.Ga.1990) ("In requiring the plaintiff to plead evidence, § 9–11–9.1 runs directly afoul of the pleading standard set out in Federal Rule 8.").

her complaint, a certificate of merit describing in some detail the relevant standard of care and the defendant's failure to meet that standard. One could argue that this effectively sets up a heightened pleading standard contrary to Rule 8, requiring more than a "short and plain statement" before a malpractice case may begin.

 This argument has some weight, and it has met with some success in the federal courts. *See, e.g., Long,* 411 F.Supp.2d at 706–07; *Braddock v. Orlando Reg'l Health Care Sys., Inc.,* 881 F.Supp. 580, 584 (M.D.Fla.1995); *Boone v. Knight,* 131 F.R.D. 609, 611 (S.D.Ga.1990). Certainly, Rules 8 and 9 are clear about when heightened pleading standards are permitted, and malpractice claims are not included within that set. But to say that these rules directly conflict with Michigan's affidavit-of-merit statute seems to require too much from the rules. Under Michigan law, an affidavit of merit is not a pleading. A malpractice action may not commence without an affidavit of merit. *See Burton v. Reed City Hosp. Corp.,* 471 Mich. 745, 691 N.W.2d 424, 429 (2005) ("[T]he failure to comply with the statutory requirement renders the complaint insufficient to commence the action."). But the Michigan Court Rules, which lists each allowable type of pleading, do not include affidavits of merit, and the Michigan Supreme Court has specifically held that affidavits of merit are not pleadings. *See* Mich. Ct. R. § 2.110(A) (listing types of pleading and stating, "No other form of pleading is allowed."); *Ligons v. Crittenton Hosp.,* 490 Mich. 61, 803 N.W.2d 271, 283–86 (2011). *But see Barnett v. Hidalgo,* 478 Mich. 151, 732 N.W.2d 472, 478 (2007) (describing

affidavit of merit as "part of the pleadings" in holding that affidavit is "generally admissible as an adoptive admission"). Plaintiffs may not amend their certificates of merit as if they were part of the pleadings. *Ligons,* 803 N.W.2d at 285–86. Nor are they held to the theory of the case initially put forward in the affidavits, though an affidavit is treated as an adoptive admission and may be used to cross-examine Plaintiff's experts if they later argue a different or contrary theory. *Barnett,* 732 N.W.2d at 478. Plaintiffs may argue that the right to present a different theory later in the case is illusory. But as the Michigan Supreme Court noted at the time, "When confronted with admissions made in their affidavits of merit, the plaintiffs may reasonably point out to the factfinder that they had access to a more limited factual development before discovery and explain the basis for any changes in opinion." *Id.* at 480.

Rules 8 and 9 apply to pleadings only, but Michigan's affidavits of merit have little in common with pleadings, aside from their being filed along with the complaint. Admittedly, the inflexible timing of Michigan's requirement does make this a more difficult question than it would be if the statute allowed an affidavit to be filed sometime after the complaint.[12] But as discussed above, the Michigan courts' treatment of affidavits of merit suggests that they do not fall within the plain language of Rules 8 and 9. *See Walker v. Armco Steel Corp.,* 446 U.S. 740, 750 n. 9, 100 S.Ct. 1978 ("The Federal Rules should be given their plain meaning."). To find a conflict here, not only would we have to

---

12. For this reason, decisions finding that other jurisdictions' delayed-affidavit requirements do not conflict with Rule 8 are of limited relevance here. *See, e.g., Chamberlain v. Giampapa,* 210 F.3d 154, 164 (3d Cir.2000) (applying New Jersey statute requiring affidavit within 60 days of answer); *Trierweiler v. Croxton and Trench Holding Corp.,* 90 F.3d 1523, 1540 (10th Cir.1996) (applying Colorado statute requiring affidavit within 60 days of complaint).

disregard the Supreme Court's instructions to read the Rules to avoid conflict, but we would have to go further and actually expand the Rules' domain beyond their plain meaning to cover nonbinding, factual statements made by a hired expert outside of the formal pleadings. *See Gasperini v. Ctr. for Humanities,* 518 U.S. 415, 427 n. 7, 116 S.Ct. 2211, 135 L.Ed.2d 659 (1996); *Shady Grove,* 130 S.Ct. at 1442 n. 7. An affidavit of merit is not a pleading under Michigan law. Nor is it one under the Federal Rules. *See* Fed.R.Civ.P. 11(a) (distinguishing between pleadings and accompanying affidavits). There is no necessary conflict here.

*Shady Grove* does not compel us to find otherwise. The majority there found an unavoidable conflict between Rule 23 and New York's statute, despite the argument that the one covered class-action eligibility and the other covered class certification eligibility. *Shady Grove,* 130 S.Ct. at 1438. The Court rejected this "entirely artificial" distinction. Because the practical effects of the two rules were identical, the attempted distinction was nothing more than a label. *Id.* Here, though, there are clear, practical differences between the rules governing pleadings and the rules governing certificates of merit, as the Michigan courts have detailed. The certificate-of-merit requirement is not simply a heightened pleading standard under another name; it is an entirely different procedure that only happens to take place contemporaneously with the pleadings. Rule 8, therefore, does not conflict with Mich. Comp. L. § 600.2912d(1).

Another potential conflict is with Rule 11, which provides that the court "may impose an appropriate sanction" on a party that presents frivolous arguments, unsupported factual allegations, and the like. Fed.R.Civ.P. 11(b)-(c); *see Garza v. Scott & White Mem'l Hosp.,* 234 F.R.D. 617,

622–23 (W.D.Tex.2005) (finding that Texas statute requiring expert report within 120 days of complaint infringed on court's discretion to impose sanctions for frivolous claims under Rule 11). It is true that both Michigan's law and Rule 11 are meant "to deter baseless filings and curb abuses." *Bus. Guides, Inc. v. Chromatic Comms. Enters.,* 498 U.S. 533, 111 S.Ct. 922, 112 L.Ed.2d 1140 (1991) (discussing "[t]he main objective of the Rule"); *Barnett v. Hidalgo,* 478 Mich. 151, 732 N.W.2d 472, 479 (2007) (holding that affidavit-of-merit requirement's purpose "is to deter frivolous medical malpractice claims by verifying through the opinion of a qualified health professional that the claims are valid"). And the Supreme Court made clear in *Burlington* that a state rule that encroaches on a federal court's range of discretionary action creates a direct conflict. *Burlington N. R.R. Co. v. Woods,* 480 U.S. 1, 7, 107 S.Ct. 967, 94 L.Ed.2d 1 (1987). But the conflict here is illusory. Whatever discretion the court has under Rule 11 to order sanctions for frivolous claims, that discretion does not include allowing a baseless malpractice suit to go forward. Michigan's statute, which requires only termination of claims unaccompanied by a proper certificate of merit, does not limit the courts' discretionary power under Rule 11 in any way. *See also Trierweiler,* 90 F.3d at 1540 (finding no conflict between Colorado statute and Rule 11 because "the statute vindicates substantive interests of Colorado not covered by Rule 11").

Other cases have discussed whether certificate-of-merit statutes limit the court's discretionary power to schedule and order discovery under Fed.R.Civ.P. 26(a). *See, e.g., Stanley v. United States,* 321 F.Supp.2d 805, 808 (N.D.W.Va.2004) ("Because Rule 26 only applies after an action is filed, there is no conflict between Rule 26 and § 55–7B–6."); *Smith v. Planned Parenthood of St. Louis Region,* 225

F.R.D. 233, 239 (E.D.Mo.2004) (finding no conflict between Rule 26 and Missouri health-care affidavit statute); *cf. Connolly v. Foudree*, 141 F.R.D. 124, 126–29 (S.D.Iowa 1992) (holding that Iowa's statute requiring early disclosure of expert witnesses did not conflict with Rule 26). The leading case finding a conflict with Rule 26(a) is *Poindexter v. Bonsukan*, 145 F.Supp.2d 800 (E.D.Tex.2001). But the statute at issue in *Poindexter* was more problematic than that at issue here. Texas's statute specifically governed the filing of expert reports, dictating their content and requiring that plaintiff file them within 180 days of filing the complaint. *Id.* at 802. Based on these requirements, the district court found that Texas's statute "abrogate[s] the discretion provided by Rules 26(a)(2) and 37." *Id.* at 808. Michigan's statute, on the other hand, does not affect the court's discretionary power over discovery issues; it simply requires a new type of filing in addition to the normal expert-report procedures. As noted above, plaintiff's experts are not bound to follow the affidavit. They can disavow the earlier affidavits and change theories if they wish. For these reasons, Michigan's law can fairly be said not to limit the discretion granted under Rule 26.[13]

The other Federal Rules present even weaker arguments for conflict with Michigan's statute, and in the absence of specific argument from the parties, these more speculative conflicts need not detain us further. *See Liggon–Redding v. Estate of Sugarman*, 659 F.3d 258, 262–65 (3d Cir. 2011) (rejecting arguments that Rules 7 and 41 conflict with affidavit-of-merit statute).

Next, we must apply the framework set out in *Hanna v. Plumer*. As discussed above, this test looks to whether refusing to apply the state rule would "unfairly discriminate against citizens of the forum State" and lead to forum-shopping. *Hanna v. Plumer*, 380 U.S. 460, 468 n. 9, 85 S.Ct. 1136, 14 L.Ed.2d 8 (1965).

Both parts of this test point toward applying Michigan's statute. Though plaintiffs with strong claims may not much care whether they file suit in a forum that requires an affidavit of merit or one that does not, plaintiffs with less substantial claims would strongly prefer to file in a court that does not require an affidavit of merit. Both forums would eventually dismiss the meritless claims, but the state court applying Mich. Comp. L. § 600.2912d(1) would resolve the litigation significantly sooner—and importantly, before the defendants incur significant discovery costs. A weak plaintiff in federal court could hope for at least some nuisance-value settlement offer, but the expected value of a frivolous claim brought under an affidavit-of-merit requirement would be much lower if not zero. This acutely raises the specter of forum-shopping.

The forum-shopping analysis goes hand in hand with the "unfair discrimination" prong. A defendant facing a meritless claim could find herself either securing a quick dismissal or facing significant defense costs, based only on whether the plaintiff is a citizen of Michigan or not. This "inequitable administration of the laws" is just the type of harm that *Erie* sought to avoid. *See Hanna*, 380 U.S. at

---

**13.** Another Texas district court applied *Poindexter* to find a conflict between Rule 26 and a different Texas statute, this one requiring only a certificate of merit more like Michigan's. *Estate of C.A. v. Grier*, 752 F.Supp.2d 763, 771–72 (S.D.Tex.2010). But this court's con-clusion, that the statute "affects the content of the complaint and accelerates the procedures of Fed.R.Civ.P. 26," is not explained and is therefore not persuasive as applied to Michigan's law.

468, 85 S.Ct. 1136. For these reasons, the court agrees with the majority of cases addressing this issue and finds that Michigan's affidavit-of-merit statute should be applied to malpractice claims brought in federal court.

It is undisputed that Plaintiff did not provide an affidavit of merit with her complaint. Her malpractice claim therefore fails. Because this disposes of Plaintiff's malpractice claim, the court need not address Defendant's remaining arguments.

### III. Conclusion

Plaintiff Jones has failed to put forth any evidence of a policy, practice, or custom that implicates Defendant CMS or Defendant Hutchinson in Mr. Jones's death, and so her claims against these defendants must be dismissed. Though Plaintiff has pointed to sufficient facts to avoid summary judgment on her § 1983 claim against Defendant Abdellatif, her state-law claim is at heart, a claim for medical malpractice, subject to the requirements that Michigan has enacted regarding such claims. Plaintiff undisputedly failed to satisfy those requirements, and so her state-law claim must be dismissed.

### ORDER

For the reasons discussed above:

1. Defendants Correctional Medical Services, Inc. and Craig Hutchinson, M.D.'s Motion to Dismiss and/or Motion for Summary Judgment (ECF No. 94) is **GRANTED;**

2. Defendant Badawi Abdellatif, M.D.'s Motion to Dismiss and/or Motion for Summary Judgment (ECF No. 139) is **GRANTED IN PART** as to Plaintiff Jones's gross negligence claim (Count III), and is otherwise **DE-NIED;**

3. All claims against Defendants Correctional Medical Services, Inc. and Craig Hutchinson, M.D. are **DISMISSED WITH PREJUDICE;** and

4. Plaintiff's "gross negligence" claim (Count III) is **DISMISSED WITH PREJUDICE.**

**IT IS SO ORDERED.**