*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

---

ESTATE OF MICHAEL WRENN, by LES
WRENN, Personal Representative,

        Plaintiff-Cross-Appellee,

v

SPECTRUM COMMUNITY SERVICES,

        Defendant-Cross-Appellant,

and

DANIEL JAMES BAERWALD and
RIVERWOOD CENTER,

        Defendants.

UNPUBLISHED
February 21, 2019

No. 339594
Berrien Circuit Court
LC No. 15-000275-NI

---

ESTATE OF MICHAEL WRENN, by LES
WRENN, Personal Representative,

        Plaintiff-Appellee,

v

SPECTRUM COMMUNITY SERVICES,

        Defendant-Appellee,

DANIEL JAMES BAERWALD and
RIVERWOOD CENTER,

        Defendants,

No. 342320
Berrien Circuit Court
LC No. 15-000275-NI

and

BRUCE DEVRIES,

        Defendant-Appellant.

_____

Before: METER, P.J., and SAWYER and CAMERON, JJ.

PER CURIAM.

The present case is a wrongful death action filed by the personal representative of the estate of decedent Michael Wrenn. In Docket No. 339594, defendant Spectrum Community Services is challenging the trial court's opinion and order denying its motion for summary disposition as a cross-appellant.[1] In Docket No. 342320, defendant Bruce DeVries appeals the trial court's order denying his motion for summary disposition on governmental immunity grounds under the governmental tort liability act (GTLA), MCL 691.1401 *et seq*. In Docket No. 339594, we affirm the trial court's denial of Spectrum's motion for summary disposition. In Docket No. 342320, we reverse the trial court's denial of DeVries's motion for summary disposition, and we remand for entry of judgment in favor of DeVries.

On December 24, 2014, Wrenn was walking alone on M-140, a roadway with a speed limit of 55 miles per hour, and was struck and killed by a pickup truck driven by Daniel Baerwald. At the time of the accident, it was dark, cold, and raining. When he was hit, Wrenn was walking in the middle of Baerwald's lane of traffic, and he was dressed entirely in dark clothing, meaning that Barewald could not see Wrenn until the accident was unavoidable.

At the time of his death, Wrenn was 59 years old and resided at the Eau Claire Adult Foster Care (AFC) facility, a Spectrum facility located not far from the site of the accident. The facility is a 12-bed home "with special certification to serve the mentally ill." Wrenn had a history of mental illness and developmental disabilities, and he had spent the majority of his life in institutions, assisted living facilities, and group homes. Notably, Wrenn had a well-known history of dangerous behaviors related to traffic. These issues included walking near fast moving traffic on main roads, failing to walk on the shoulder away from traffic, failing to look before crossing, and walking after dark wearing dark clothing. There were documented reports of Wrenn walking in the middle of the road and putting his hands out toward passing vehicles.

---

[1] In Docket No. 339594, defendant Riverwood Center appealed the trial court's order denying Riverwood Center's motion for summary disposition on governmental immunity grounds; however, Riverwood Center has been dismissed from the case, and its appeal is no longer pending. Nevertheless, Spectrum's cross-appeal remains pending. See MCR 7.207(D); *Costa v Community Emergency Med Servs, Inc*, 263 Mich App 572, 583-585; 689 NW2d 712 (2004), aff'd 475 Mich 403 (2006). Defendant Daniel Baerwald has been dismissed from the case with prejudice, and he is not a party to this appeal.

-2-

Indeed, Wrenn had been known to "play with cars," which included dodging traffic, jumping in front of cars, and "playing chicken" with vehicles. As summarized in an e-mail by DeVries in October 2012, Wrenn's practices amounted to "health and safety issues that could cause a serious accident."

Beginning in 1994, Wrenn received services from the Riverwood Center, a governmental agency also known as the Berrien Mental Health Authority, which provides services to persons with developmental disabilities and serious mental illnesses. DeVries is a limited-licensed behavioral psychologist, employed by Riverwood Center. Significant to this appeal, in April 2014, when Wrenn returned to live at the Eau Claire AFC, DeVries developed an updated Behavior Treatment Plan for Wrenn to address various behavioral problems, including dangerous behaviors related to walking in the community. In DeVries's updated 2014 Behavior Treatment Plan, DeVries expressly acknowledged Wrenn's problem with walking in the community, particularly along M-140, a roadway with a speed limit of 55 mph. To address these dangerous behaviors, DeVries outlined a strategy for Wrenn's "movement in the community." Unlike previous plans that did not allow for freedom of movement, the updated plan allowed Wrenn to leave the Eau Claire AFC unsupervised. Specifically, the strategy was as follows:

> [Wrenn] will be required to sign the home, [sic] log indicating where he is going and the approximate time that he will return. [Wrenn] will be allowed 4 hours of community time, if he chooses to each day (hours will not accumulate over one day). Staff will caution him if there is bad weather predicated that day. He will not access the community. If severe weather is present during the time [he] wants to go into the community, he will not be able to until the weather clears. He will return to the home by 6 PM, and [he] will not leave the home to go into the community after 6 PM (unless he has motorized transportation and approval from staff). If he does not return time [sic], a half hour will be deducted from the next time he accesses the community. It will take two times of being on time to restore his community time to full time. If [Wrenn] is going to access the community after 6 PM, it will need to be with a friend or family member picking him up in a vehicle and working out the details with staff. If he leaves with a friend or family member, [Wrenn] will have the [sic] return to the home by 9 PM.

Wrenn was still under this Behavioral Treatment Plan at the time of his death.

On December 24, 2014, the night of Wrenn's death, the Eau Claire AFC staff allowed Wrenn to leave the facility at approximately 5:45 p.m. When Wrenn left the facility, the conditions were described as "nighttime, drizzly, and cold." Wrenn was dressed entirely in dark clothing and did not sign out before leaving the facility. At approximately 5:53 p.m., Wrenn was struck and killed while walking along M-140.

Les Wrenn, Wrenn's brother and the personal representative of Wrenn's estate, filed the current lawsuit against Spectrum in December 2015. DeVries was added as a defendant in July 2017. Both Spectrum and DeVries moved for summary disposition, and the trial court denied their respective motions. The present appeals followed.

Spectrum argues that the trial court erred by denying its motion for summary disposition under MCR 2.116(C)(10) because no material questions of fact remain and Spectrum cannot be considered negligent when it did not breach a duty to Wrenn. Specifically, Spectrum asserts that it was legally required to implement the Behavior Treatment Plan and to allow Wrenn freedom of movement before 6:00 p.m. Given that Wrenn left the Eau Claire AFC before 6:00 p.m. on the night of his death, Spectrum maintains that it complied with the plan and did not breach a duty owed to Wrenn. We disagree and conclude that summary disposition was properly denied because whether Spectrum breached a duty to Wrenn presents a factual question for the jury to decide.

We review de novo a trial court's decision on a motion for summary disposition. *Sisk-Rathburn v Farm Bureau Gen Ins Co of Mich*, 279 Mich App 425, 426-427; 760 NW2d 878 (2008). "When reviewing a motion under MCR 2.116(C)(10), which tests the factual sufficiency of the complaint, this Court considers all the evidence submitted by the parties in the light most favorable to the non-moving party and grants summary disposition only where the evidence fails to establish a genuine issue regarding any material fact." *Sisk-Rathburn*, 279 Mich App at 427. "A genuine issue of material fact exists when the record, giving the benefit of reasonable doubt to the opposing party, leaves open an issue upon which reasonable minds might differ." *West v Gen Motors Corp*, 469 Mich 177, 183; 665 NW2d 468 (2003).

"To establish a prima facie case of negligence, a plaintiff must prove four elements: (1) a duty owed by the defendant to the plaintiff, (2) a breach of that duty, (3) causation, and (4) damages." *Case v Consumers Power Co*, 463 Mich 1, 6; 615 NW2d 17 (2000). " 'Duty' is a legally recognized obligation to conform one's conduct toward another to what a reasonable man would do under similar circumstances." *Finazzo v Fire Equip Co*, 323 Mich App 620, 625; 918 NW2d 200 (2018). "A duty of care may arise from a statute, a contractual relationship, or by operation of the common law . . . ." *Cummins v Robinson Twp*, 283 Mich App 677, 692; 770 NW2d 421 (2009). "If an actor's standard of care does not include certain conduct, then the actor is under no duty with respect to that conduct." *Howe v Detroit Free Press, Inc*, 219 Mich App 150, 155; 555 NW2d 738 (1996), aff'd 457 Mich 871 (1998). "As a general rule, there is no duty to aid or protect another." *Hammack v Lutheran Social Servs of Mich*, 211 Mich App 1, 4; 535 NW2d 215 (1995). "However, a limited exception to this rule arises when a special relationship exists between the plaintiff and the defendant." *Id*. "In a special relationship, one person entrusts himself to the control and protection of another, with a consequent loss of control to protect himself." *Dykema v Gus Macker Enterprises, Inc*, 196 Mich App 6, 9; 492 NW2d 472 (1992). Whether a duty exists is a question for the court to be decided as a matter of law. *Lelito v Monroe*, 273 Mich App 416, 419; 729 NW2d 564 (2006).

"Once the question of duty has been determined, the question whether a defendant was negligent, i.e., whether the defendant breached its duty, is generally a question of fact." *Boumelhem v Bic Corp*, 211 Mich App 175, 181; 535 NW2d 574 (1995). "What constitutes reasonable care under the circumstances must be determined from the facts of the case." *Riddle v McLouth Steel Prod Corp*, 440 Mich 85, 97; 485 NW2d 676 (1992). "Stated another way, the jury usually decides the *specific* standard of care that should have been exercised by a defendant in a given case." *Case*, 463 Mich at 7. For this reason, whether a defendant has breached a duty

of care is ordinarily not properly decided by summary disposition. *Latham by Perry v Nat'l Car Rental Sys, Inc*, 239 Mich App 330, 340; 608 NW2d 66 (2000). Nevertheless, if the facts are not in dispute and reasonable minds could not differ, a court may determine whether a defendant's conduct fell below the applicable standard of care. *Case*, 463 Mich at 7.

In this case, Spectrum does not appear to dispute that, as a general proposition, it owed Wrenn a duty. As a resident of Eau Claire AFC, Wrenn had been entrusted to Spectrum's care and control for the provision of supervision and protection.[2] Further, as a facility providing care for individuals with mental illnesses, Spectrum had an obligation to provide Wrenn with "mental health services suited to his . . . condition," MCL 330.1708(1), and to provide a "safe" environment, MCL 330.1708(2). In Wrenn's case, his mental health treatment involved the implementation of the Behavior Treatment Plan developed by DeVries, including the provision regarding Wrenn's movement in the community. See MCL 330.1712. As an adult foster care facility, the Eau Claire AFC was required to implement Wrenn's personalized assessments. See Mich Admin Code R 400.1407(2); Mich Admin Code R 400.1408(1) and (3). Clearly, there was a special relationship between Spectrum and Wrenn, and given this special relationship, Spectrum owed Wrenn a duty of care, including a duty to implement the Behavior Treatment Plan for Wrenn's protection. See *Hammack*, 211 Mich App at 4-5.

Given that Spectrum owed Wrenn a duty, whether Spectrum breached the standard of care would generally be a question for the trier-of-fact to evaluate on the basis of the particular facts of this case. See *Case*, 463 Mich at 7; *Hammack*, 211 Mich App at 5. Nevertheless, Spectrum asserts that summary disposition is appropriate because the Eau Claire AFC staff members complied with the Behavior Treatment Plan. This argument lacks merit.

To begin with, as a general matter, while Spectrum attempts to frame its duty under the Behavior Treatment Plan as first and foremost an obligation to provide Wrenn with freedom of movement, the plan is more fairly read as imposing a duty on Spectrum to *restrict* Wrenn's freedom of movement in order to keep Wrenn safe. That is, although Wrenn was allowed some freedom of movement, see MCL 330.1708(3); Mich Admin Code R 400.1409(1)(b), the Behavior Treatment Plan expressly alerted Spectrum to Wrenn's propensity toward dangerous behaviors in traffic as well as the likely harms that could result from these behaviors, and it set forth a plan of action to *limit* Wrenn's movements in order to protect Wrenn from harm. For instance, the plan imposed time and weather restrictions on Wrenn's movements, and Spectrum was required to have Wrenn sign out and disclose his destination and approximate his time of return before leaving the home. Viewing the Behavior Treatment Plan as imposing a duty on Spectrum to regulate Wrenn's movements for his own protection, the question is not whether Spectrum honored Wrenn's right to freedom of movement; the question is whether Spectrum exercised reasonable care under the circumstances to protect Wrenn while he moved around in

---

[2] See MCL 400.704(7) (" 'Foster care' means the provision of supervision, personal care, and protection in addition to room and board, for 24 hours a day, 5 or more days a week, and for 2 or more consecutive weeks for compensation.").

the community. Whether Spectrum breached this duty is a question for the fact-finder. See *Hammack*, 211 Mich App at 5.

In particular, the evidence shows that Wrenn left the facility at 5:45 p.m. on December 24, 2014. Staff did not require Wrenn to sign out before leaving, nor did they determine his intended destination. Instead, they allowed him to leave unsupervised, despite his failure to follow the rules for movement in the community and despite his agitated state shortly before he left the home on the night in question.[3] When he left the facility, it was dark, and Wrenn was dressed all in dark clothing. The weather was "cold." It had been "misting" all day, the roads were "wet," and the accident report described the weather conditions as consisting of "rain." In other words, viewing the evidence in a light most favorable to plaintiff, the record shows that, knowing of Wrenn's tendency to walk into traffic and to play games with cars, the staff at Eau Claire AFC allowed Wrenn, dressed entirely in dark clothing, to leave the facility alone on a dark, rainy winter night to walk along a roadway with a speed limit of 55 mph. Given the special relationship between Wrenn and Spectrum, reasonable minds could conclude that Spectrum's actions were not reasonable under the circumstances.

Despite the weather conditions and the darkness, Spectrum maintains that reasonable minds could not find that it breached a duty because Wrenn was allowed freedom of movement before 6:00 p.m. Specifically, Spectrum suggests that the weather was not "severe" on the night in question, and therefore, Spectrum did not breach a duty by allowing Wrenn to leave in the rain before 6:00 p.m. More fully, the Behavior Treatment Plan states that "[i]f severe weather is present during the time [Wrenn] wants to go into the community, he will not be able to until the weather clears." There is no definition of the term "severe weather" in the plan, but reasonable minds could conclude that a dark, rainy, and cold December evening in Michigan is the sort of "severe weather" in which Wrenn should not have been allowed to walk unsupervised in the community, particularly when the closest roadway was the unlit M-140. Indeed, the plan draws a distinction between "severe weather" and weather that has "clear[ed];" there is no indication that Wrenn should have been permitted to access the community in weather that was significantly less than "clear." Moreover, there is nothing in the plan that required Spectrum to allow Wrenn to proceed unsupervised into the community dressed entirely in dark clothing, at night, on a poorly lit road with a speed limit of 55 mph. On the whole, while the plan provided Wrenn with some freedom of movement, it also imposed a duty on Spectrum to regulate Wrenn's movement for his own safety. And, contrary to Spectrum's arguments, reasonable minds could conclude that Spectrum failed to abide by the plan's requirements and that Spectrum breached a duty by allowing Wrenn to leave the facility on the night of his death. Given the special relationship between Wrenn and Spectrum, the reasonableness of Spectrum's conduct under the circumstances on the night in question is for the jury. Cf. *Hammack*, 211 Mich App at 3, 5 (finding that individual plan of service allowing the decedent, who drowned in a bathtub, to

---

[3] Wrenn became upset that evening when told to give another resident of the facility privacy to visit with her family. According to descriptions of Wrenn's past behavior, his mood was known to affect his behavior in traffic; specifically, when he was mad, he was known to "put a blanket over his head and walk into the road."

be unsupervised for up to five hours a day did not warrant summary disposition because whether staff was negligent in failing to monitor him while he bathed was a question for the jury). Accordingly, the trial court did not err by denying Spectrum's motion for summary disposition.

## II. DOCKET NO. 342320

DeVries argues on appeal that the trial court erred by denying his motion for summary disposition. First, DeVries argues that plaintiff's claim sounds in medical malpractice, not negligence, and that because plaintiff failed to comply with the procedural requirements for medical malpractice, a malpractice claim against Devries is time-barred and summary disposition is appropriate on statute of limitations grounds.[4] Second, DeVries argues that the trial court erred by denying his motion for summary disposition on governmental immunity grounds because his conduct did not amount to gross negligence that was the proximate cause of Wrenn's death. We agree that summary disposition should have been granted because plaintiff's claims, sounding in medical malpractice, are time-barred. Given this conclusion, we need not decide whether DeVries was also entitled to summary disposition on governmental immunity grounds.

We review de novo a trial court's decision on a motion for summary disposition. *Sisk-Rathburn*, 279 Mich App at 426-427. Likewise, "[w]hether a claim sounds in ordinary negligence or medical malpractice is a question of law that is reviewed de novo." *Trowell v Providence Hosp & Med Ctrs, Inc*, 502 Mich 509, 517; 918 NW2d 645 (2018). "In determining whether the nature of a claim is ordinary negligence or medical malpractice, as well as whether such claim is barred because of the statute of limitations, a court does so under MCR 2.116(C)(7)." *Bryant v Oakpointe Villa Nursing Ctr*, 471 Mich 411, 419; 684 NW2d 864 (2004). "If there is no factual dispute, whether a plaintiff's claim is barred under the applicable statute of limitations is a matter of law for the court to determine." *Kincaid v Cardwell*, 300 Mich App 513, 523; 834 NW2d 122 (2013).

In this case, it is uncontested that, if plaintiff's claims sound in medical malpractice, plaintiff's claims are time-barred because the two-year period of limitations has expired, MCL 600.5805(8), and plaintiff failed to comply with the notice of intent and affidavit of merit requirements for a medical malpractice action under MCL 600.2912b and MCL 600.2912d. See *Burton v Reed City Hosp Corp*, 471 Mich 745, 754-756; 691 NW2d 424 (2005); *Castro v*

---

[4] We note that DeVries's appeal as of right arises from an order denying his motion for summary disposition on the basis of governmental immunity. See MCR 7.202(6)(a)(*v*). Under MCR 7.203(A)(1), "[a]n appeal from an order described in MCR 7.202(6)(a)(iii)-(v) is limited to the portion of the order with respect to which there is an appeal of right." In other words, "in an appeal by right from an order denying a defendant's claim of governmental immunity, such as this one, this Court does not have the authority to consider issues beyond the portion of the trial court's order denying the defendant's claim of governmental immunity." *Pierce v Lansing*, 265 Mich App 174, 182; 694 NW2d 65 (2005). DeVries's argument that summary disposition should have been granted because plaintiff's claim sounds in medical malpractice is beyond the trial court's ruling on governmental immunity. Nevertheless, in the interest of judicial economy, we will consider the issue as on leave granted. See *id*. at 182-183.

*Goulet*, 312 Mich App 1, 4; 877 NW2d 161 (2015). The dispositive question before us is whether this case is one for medical malpractice to which these procedural requirements apply or whether the case sounds in negligence. See generally *Dorris v Detroit Osteopathic Hosp Corp*, 460 Mich 26, 43; 594 NW2d 455 (1999).

"A medical-malpractice claim is defined as a claim that arises during the course of a professional relationship and involves a question of medical judgment." *Lockwood v Mobile Med Response, Inc*, 293 Mich App 17, 23; 809 NW2d 403 (2011). To determine whether a claim sounds in medical malpractice or negligence, a court must ask two fundamental questions: "(1) whether the claim pertains to an action that occurred within the course of a professional relationship; and (2) whether the claim raises questions of medical judgment beyond the realm of common knowledge and experience." *Bryant*, 471 Mich at 422. "If both these questions are answered in the affirmative, the action is subject to the procedural and substantive requirements that govern medical malpractice actions." *Id*. In contrast, "[i]f either prong is not met, the action sounds in ordinary negligence rather than medical malpractice." *Potter v McLeary*, 484 Mich 397, 414; 774 NW2d 1 (2009).

With regard to the professional relationship prong, plaintiff conceded in the trial court, and concedes on appeal, that the claims against DeVries pertain to an action that occurred within the course of a professional relationship. Thus, the first prong has been met. See *Bryant*, 471 Mich at 422. "After ascertaining that the professional relationship test is met, the next step is determining whether the claim raises questions of medical judgment requiring expert testimony or, on the other hand, whether it alleges facts within the realm of a jury's common knowledge and experience." *Id*. at 423.

> If the reasonableness of the health care professionals' action can be evaluated by lay jurors, on the basis of their common knowledge and experience, it is ordinary negligence. If, on the other hand, the reasonableness of the action can be evaluated by a jury only after having been presented the standards of care pertaining to the medical issue before the jury explained by experts, a medical malpractice claim is involved. [*Id*.]

Typically, questions regarding the monitoring and supervision needed for a patient involve matters of professional judgment beyond the common knowledge and experience of laymen. See, e.g., *Trowell*, 502 Mich at 523; *Bryant*, 471 Mich at 427; *Dorris*, 460 Mich at 46-47; *Starr v Providence Hosp*, 109 Mich App 762, 765-766; 312 NW2d 152 (1981). In other words, particular needs may vary from patient to patient depending on their medical condition. Knowing how to correctly monitor and supervise patients requires specialized and particularized knowledge to, for example, understand the patient's specific needs, identify risks faced by the individual patient, and understand how a patient's disease may influence behavior. See *Bryant*, 471 Mich at 426-427, 429.

However, notably, "a jury relying on common knowledge and experience could determine whether the defendant was negligent for failing to take corrective action in response to a known danger." *Trowell*, 502 Mich at 521. For example, in *Bryant*, staff members discovered the decedent entangled in her bedding between the bed rails and mattress, and yet, knowing that the decedent was at risk of asphyxiation by slipping between the bed rails, staff took no

-8-

corrective action to address the risk. *Bryant*, 471 Mich at 430. The following day, the decedent asphyxiated after slipping between the rails of her bed, *id*. at 417, and the Michigan Supreme Court concluded that the plaintiff's claim that the nursing home failed to take steps to protect the decedent from a known risk sounded in ordinary negligence, explaining:

> [P]laintiff's allegation . . . is not that defendant took inappropriate steps in dealing with the patient's compulsive sliding problem or that defendant's agents were negligent in creating the hazard in the first place. Instead, plaintiff claims that defendant knew of the hazard that led to her death and did nothing about it.
>
> This claim sounds in ordinary negligence. No expert testimony is necessary to determine whether defendant's employees should have taken *some sort* of corrective action to prevent future harm after learning of the hazard. The fact-finder can rely on common knowledge and experience in determining whether defendant ought to have made an attempt to reduce a known risk of imminent harm to one of its charges. [*Id*. at 430-431.]

In other words, "[n]o expert testimony is necessary to show that the defendant acted negligently by failing to take *any* corrective action after learning of the problem." *Id*. at 431 (emphasis added).

> Professional judgment might be implicated if plaintiff alleged that defendant responded inadequately, but, given the substance of plaintiff's allegation in this case, the fact-finder need only determine whether *any* corrective action to reduce the risk of recurrence was taken after [the] defendant's agents noticed that [the decedent] was in peril. Thus, [the] plaintiff has stated a claim of ordinary negligence under the standards articulated in *Dorris*. [*Id*. at 431-432.]

In this case, with regard to DeVries, plaintiff's complaint alleged negligence, asserting that DeVries was grossly negligent in (1) creating a behavioral plan that allowed Wrenn complete freedom of movement despite knowing of Wrenn's propensity to wander and play with cars, (2) creating a behavioral plan that allowed Wrenn complete freedom of movement despite knowing of previous behavioral plans that restricted Wrenn's movements as well as knowing of Wrenn's propensity to leave the facility at all hours, (3) allowing Wrenn to dictate a 6:00 p.m. return time when DeVries stated that he initially wanted to restrict Wrenn's freedom of movement to movement before 5:00 p.m., and (4) failing to write a plan that provided for one-on-one supervision of Wrenn.

Considering plaintiff's allegations, we conclude that plaintiff's claims sound in medical malpractice, not negligence, and therefore, the trial court erred by denying Wrenn's motion for summary disposition on statute of limitations grounds. Undisputedly, Wrenn had developmental disabilities and several mental illness diagnoses. As a general matter, the ordinary layman does not know how much freedom of movement should be afforded an adult with mental illnesses and developmental disabilities, nor does the ordinary layman know under what conditions, or with what level of supervision, an individual with a particular mental illness should be allowed to exercise freedom of movement. Cf. *Dorris*, 460 Mich at 46-47 ("The ordinary layman does not know the type of supervision or monitoring that is required for psychiatric patients in a

psychiatric ward."). Instead, the amount of supervision and monitoring needed for Wrenn required specialized knowledge of his conditions and his individualized needs in light of those conditions, including knowledge of how his conditions may influence his behavior. See *Trowell*, 502 Mich at 524; *Bryant*, 471 Mich at 426-427. In other words, expert testimony, beyond the ken of ordinary laymen, will be required to evaluate the adequacy of DeVries's treatment plan in light of Wrenn's diagnoses, capabilities, and particular medical needs. See *Bryant*, 471 Mich at 426-427.

Further, contrary to plaintiff's arguments, this is not a case in which DeVries failed to take *any* action in response to a known risk. See *id*. at 430-432. Plaintiff alleges that DeVries was aware of Wrenn's dangerous propensities, including his past acts of playing with traffic and walk in the roadway, and yet DeVries drafted an inadequate plan that allowed too much freedom for Wrenn. But, unlike the situation in *Bryant* involving the known risk of asphyxiation and a complete failure to take *any* corrective action, plaintiff does not contend that DeVries completely failed to act. Undisputedly, DeVries crafted a plan that restricted Wrenn's freedom of movement on the basis of the time and weather. In other words, DeVries did take *some* corrective action in response to a known risk to Wrenn's safety in order to reduce the likelihood of future harm to Wrenn. See *id*. at 430. By asserting that DeVries responded inadequately to the danger to Wrenn in light of his conditions and known behavioral tendencies, plaintiff has raised a claim implicating matters of professional judgment. See *id*. at 431. Accordingly, plaintiff's claim sounds in medical malpractice, not ordinary negligence.[5] It follows that, because plaintiff has not met the procedural requirements for medical malpractice and the statute of limitations for medical malpractice has expired, plaintiff's claims against DeVries are time-barred, and DeVries was entitled to summary disposition. See *Trowell*, 502 Mich at 525.

---

[5] On appeal, plaintiff argues that a claim involving allegations of gross negligence cannot sound in medical malpractice, and relying on *Costa v Community Emergency Med Servs, Inc*, 475 Mich 403; 716 NW2d 236 (2006), plaintiff contends that the procedural requirements for medical malpractice are irrelevant in a case involving claims of gross negligence against a governmental defendant such as DeVries. We find this argument to be without merit. While plaintiff's argument seems to suggest that "gross negligence" is a distinct claim under MCL 691.1407(2), the GTLA "does not itself create a cause of action called 'gross negligence.' " *Cummins*, 283 Mich App at 692. Further, while plaintiff argues that *Costa* eliminated the procedural requirements for medical malpractice in cases involving gross negligence, we do not read *Costa* in this manner. Instead, *Costa* made plain that, in the medical malpractice context, gross negligence is an "additional showing" required in a case involving a governmental defendant. *Costa*, 475 Mich at 412. Ultimately, rather than completely relieve the parties of medical malpractice procedural requirements in cases involving allegations of gross negligence, *Costa* recognized that governmental immunity provisions under the GTLA *and* procedural requirements for medical malpractice can potentially be relevant in a given case. See *id*. at 413-414. The question of whether a claim of gross negligence can sound in medical malpractice under Michigan law, particularly in light of *Costa*, was thoroughly analyzed by the Federal District Court for the Western District of Michigan in *Jones v Correctional Med Servs, Inc*, 845 F Supp 2d 824, 846-847 (WD Mich, 2012), and we find the reasoning in *Jones* persuasive.

In Docket No. 339594, we affirm the trial court's denial of Spectrum's motion for summary disposition and remand for further proceedings. In Docket No. 342320, we reverse the trial court's denial of DeVries's motion for summary disposition, and we remand for entry of judgment in favor of DeVries. We do not retain jurisdiction.

/s/ Patrick M. Meter
/s/ David H. Sawyer
/s/ Thomas C. Cameron